IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NEW YORK

GIUSEPPE D'ALESSANDRO,

                                        Petitioner,

                -vs-                                **No. 08-CV-914(RJA)(VEB)**

                                                    **REPORT AND**
MICHAEL B. MUKASEY, United States                   **RECOMMENDATION**
Attorney General; MICHAEL CHERTOFF,
Secretary of the Department of Homeland Security;
MARTIN HERRON, Assistant Field Office
Director for the Buffalo Federal Detention Facility
for United States Immigration and Customs
Enforcement; and all other persons exercising
direct legal control over the Petitioner,

                                        Respondents.

## I.    Introduction

        Represented by counsel, petitioner Giuseppe D'Alessandro (hereinafter, "D'Alessandro"

or "petitioner"), an alien under a final order of removal, seeks a writ of habeas corpus pursuant

to 28 U.S.C. § 2241 challenging is continued detention in respondents' custody (hereinafter,

"respondents", "DHS/ICE", or "the Government"). This matter has been referred to the

undersigned pursuant to 28 U.S.C. § 636(b)(1). For the reasons that follow, I recommend that

D'Alessandro's petition be granted and that a writ of habeas corpus issue directing his release

from custody subject to appropriate conditions of supervision by DHS/ICE.

## II.   Factual Background and Procedural History

        On July 25, 1978, petitioner entered the U.S. under a B-2 visa. On June 22, 1981, his

immigration status adjusted at Philadelphia, PA, to a Legal Permanent Resident under INA §245.

Petitioner is married with one son; his wife and son are U.S. citizens and live in Queens, New

York. On August 14, 1989, D'Alessandro was arrested on charges of Kidnaping 1st (with intent

to collect ransom; class A-1); Attempted Robbery 1st (class C); Coercion 1st (class D); Non-Auto

Grand Larceny 2nd (class D); and Assault 2nd (intent to cause bodily injury). This was his first

and only contact with the criminal justice system.[1]  D'Alessandro remained free on bond during

the pendency of his criminal proceedings.

Apparently with the advice and consent of his trial counsel, D'Alessandro rejected a plea

offer involving probation *only* and no jail time, and elected to proceed to trial. On June 25, 1991,

a guilty verdict was entered in New York State Supreme Court, County of New York, following

a jury trial. Upon D'Alessandro's motion to set aside the verdict under New York Criminal

Procedure Law ("C.P.L.") § 330.30, the trial court granted a new trial, holding that the

cumulative effect of the prosecutor's misconduct was overwhelmingly prejudicial. The District

Attorney appealed. On December 22, 1993, the Appellate Division, First Department, reversed

the trial court and reinstated the jury's verdict. *People v. D'Alessandro*, 184 A.D.2d 114 (App.

Div. 1st Dept. 1992). The First Department held that the prosecutor "on occasion did exceed the

bounds of legitimate fair comment as when, for example, she suggested that a witness might be

exposing himself to danger by testifying, appealed to the jurors' generalized fear of crime, and

their sympathies, and vouched for the credibility of the People's witnesses." *Id.* (citations

omitted). However, the summation "was within the range of acceptability, and it cannot be

reasonably found that she tried to depict defendant as a mobster who merited punishment for his

---

[1]     The underlying conviction arose out of a dispute between petitioner and an employee who worked
at the restaurant owned by petitioner's father-in-law and where petitioner worked as a manager. The employee was
suspected of stealing $3,000 from the restaurant. According to the employee, after they argued about the money,
petitioner confined him in the restaurant's basement for over 12 hours, threatening him with a gun and seeking return
of the money. Petitioner maintained that he did not confine the employee. He rejected a plea to probation only.
(Docket No. 1).

general character and intimidation of witnesses rather than for the specific crimes with which he was charge." *Id.* Because the First Department found the proof of guilt "overwhelming," any misconduct was "harmless error" and petitioner's right to a fair trial "was not abridged as a matter of law." *Id.* Accordingly, "the trial court was not warranted in granting the motion to vacate the conviction under C.P.L. § 330.30." *Id.*

Throughout this time, D'Alessandro was released on bond. On April 20, 1993, petitioner appeared voluntarily for sentencing, knowing that he was to be sentenced to a minimum of fifteen (15) years in prison. After stating his dismay at having to sentence D'Alessandro to jail time, the trial court imposed concurrent terms of imprisonment, the longest of which was 15 years to life on the Kidnaping 1st conviction. This was the mandatory minimum under the Penal Law.

On May 10, 1993, petitioner entered NYSDOCS and serves his term at Arthurkill Correctional Facility on Staten Island. During his incarceration, he maintained an "exemplary" record, as attested to by the District Attorney, John Irwin, who on dated June 26, 2007, wrote a letter of support together with the prosecuting deputy, regarding D'Alessandro's first, successful parole application. (Docket No. 7-2).

On August 22, 1996, the First Department affirmed D'Alessandro's conviction on direct appeal, finding that the evidence was "overwhelming," rendering the any prosecutorial misconduct harmless error; the jury's determination as to fact and credibility were supported by the record; the claim regarding the propriety of the kidnaping jury instructions was un preserved; and the "available record indicates that defendant received the effective assistance of counsel, trial counsel having made appropriate pre-trial, trial and post-trial motions and applications,

vigorously cross-examined the People's witness and presented witnesses in support of the defense position that there had been no abduction or restraint of the complainant, and interposed numerous objections to summation comments by the prosecutor. Trial counsel's failure to object to the jury charge on kidnaping in the first degree, which in any event does not constitute reversible error in the circumstances, does not render trial counsel's representation less than meaningful." *People v. D'Alessandro*, 230 A.D.2d 656, 656-57 (App. Div. 1st Dept. 1996).

On February 19, 1998, DHS issued a notice to appear based upon his New York state convictions, which are considered "aggravated felony" convictions rendering petitioner removable under INA § 237(a)(2)(A)(iii).

On or about October 26,1998, or November 17, 1998, an Immigration Judge ("IJ") in Fishkill, New York, ordered petitioner deported. The IJ found petitioner ineligible for a waiver of his inadmissibility under former section 212© of INA, 8 U.S.C. § 1182©, because he was in removal proceedings.

On March 30, 1999, the Bureau of Immigration Appeals ("BIA") affirmed the IJ's decision ordering deportation.

On October 15, 2007, ICE informed DHS that they had valid travel document for petitioner, and when New York State Department of Correctional Services ("NYSDOCS") set a release date, they would take him into DHS custody and arrange for his departure from the U.S.

On November 19, 2007, after serving 14 ½ years of 15-to-life sentence, petitioner was released on parole after his first parole appearance. He was immediately placed in custody of U.S. immigration.

On November 27, 2007, the BIA denied D'Alessandro's motion to reopen immigration

proceedings based upon petitioner's claim that he was eligible for relief under former § 212© of the INA in light of the Supreme Court's decision in *St. Cyr v. INS*, 533 U.S. 289 (2001).[2]

On November 27, 2007, D'Alessandro filed petition for review of BIA's denial of motion to reopen in the United States Court of Appeals for the Second Circuit. He also moved for a formal stay order from Circuit.

On February 19, 2008, DHS denied D'Alessandro release after the 90-day custody review on the basis that his removal was "reasonably foreseeable." Charles Mule, Acting Field Office Director, issued the Decision to Continue Detention, stating that D'Alessandro had "failed to demonstrate that there is no significant like hood [sic] of your repatriation in the foreseeable future, pending the 2nd Circuit issues [sic] a decision on your case." (Docket No. 4-3). This decision was "made based on a review of your file and consideration of information you

---

[2]    The BIA found that the final administrative order having been filed on 3/30/1999, the motion to reopen was untimely, and it declined to exercise its *sua sponte* power to reopen. The BIA stated that even if it were to treat the motion as specially relating to a § 212(c) waiver in light of the recently enacted regulations, it would still be untimely under 8 C.F.R. § 1003.44 (2007); the deadline for special motions was 4/26/2005, and petitioner filed his motion on 10/23/2007. Furthermore, the BIA found that petitioner had not shown that he was eligible for a waiver under former § 212(c) at the time he appeared before the IJ in 1998, because petitioner served in excess of 5 years in state prison for his aggravated felony conviction. Finally, BIA found that it did not matter whether petitioner was in removal or deportation proceedings at the time his § 212(c) waiver was requested; that made no difference to the outcome.  Note that INA former § 212(c) provided discretionary relief from deportation for aliens convicted of aggravated felonies who served terms of imprisonment less than five years. The new immigration statute, IIRIRA, and AEDPA, repealed this section. However, the Supreme Court held in *St. Cyr* that "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of the plea under the law then in effect"). This decision reflected approval of the Second Circuit's decision below in *St. Cyr v. INS*, 229 F.3d 406 (2d Cir. 2000), that "the bar on applying relief enacted in AEDPA § 440(d) and IIRIRA § 304 does not apply to an alien who pled guilty or *nolo contendre* to an otherwise qualifying crime prior to IIRIRA's enactment date."  In *Ponnapula v. Ashcroft*, 373 F.3d 480 (2d Cir. 2004), the Third Circuit applied the rationale of *St. Cyr* to provide § 212(c) relief to an alien who relied upon the attenuated availability of § 212(c) to *decline* a plea agreement, finding that IIRIRA's elimination of § 212(c) was impermissibly retroactive when applied to aliens electing to go to trial on the reasonable reliance of the availability of § 212(c) relief. D'Alessandro's counsel is relying upon *Ponnapula* as support in connection with the petition to reopen pending in the Second Circuit. Counsel he notes in the Motion to Stay that one of the state-court post-conviction motions filed in D'Alessandro's case involved trial counsel's "failure . . . to properly engage in, and advise on, plea negotiations when the defendant had been offered a lesser felony with a probationary sentence." (Docket No. 4-3). As noted *infra*, briefing has not concluded in the Second Circuit on petitioner's motion to reopen the BIA's denial of the motion to reopen on the former § 212(c) issue.

submitted to ICE's reviewing officials." *Id.* No specific mention was made of D'Alessandro's criminal history, flight risk, danger to the community, or other release considerations set forth in 8 C.F.R. § 241.4 in this letter.

On October 20, 2008, petitioner's attorney requested a custody review by DHS. (Docket No. 4-3). In an undated letter, received by petitioner's counsel on November 10, 2008, Martin Herron of DHS denied the request for release "[u]pon the totality of information involved in this case" and stated "[t]here is no appeal to this decision." (Docket No. 4-3).

On November 26, 2008, the New York Court of Appeals, in an unusual move, agreed to review D'Alessandro's conviction by mandamus. The Court of Appeals certified that "questions of law requiring review pursuant to C.P.L. § 460.20 were involved in the order of the First Department's Appellate Division dated 8/19/2008, denying defendant's motion for reargument of the denial of his writ of error *coram nobis* entered 5/11/2000 (*People v. D'Alessandro*, 272 A.D.2d 1002 (App. Div. 1ˢᵗ Dept. 2000)." *See People v. D'Alessandro*, 11 N.Y.3d 854 (N.Y. Nov. 26, 2008).

On December 15, 2008, through counsel, D'Alessandro filed the instant 28 U.S.C. § 2241 petition for habeas corpus relief in this Court.

On January 28, 2009, the Second Circuit granted petitioner's motion for extension of time until February 18, 2009, to file his reply brief on the petition for reopening; however, no decision was rendered on the stay request. There is no official indication on the Second Circuit's docket at this time as to when oral argument will be held or a final decision rendered. Respondents' attorney indicated at the hearing held before me on March 20, 2009, that oral argument has been proposed for sometime in April 2009, before the Second Circuit.

On February 10, 2009, petitioner's counsel submitted a letter providing an update of D'Alessandro's circumstances and requesting another custody review from DHS. On February 11, 2009, Martin Herron ("Herron"), Field Office Director with DHS, issued a letter decision to continue D'Alessandro's custody based upon a "review of your file and/or your personal interview and consideration of any information you submitted to ICE's reviewing officials." (Docket No. 4-3). After reviewing the underlying conviction and immigration proceedings, Herron stated, "Your criminal history includes convictions for kidnapping [sic] with intent to collect ransom, attempted robbery-1st, Assault with intent to cause bodily injury, attempted grand larceny-2nd and coercion. These convictions are considered severe in nature making you a threat to the community and a flight risk. Because of this history of disregard for the laws and order of the United States and its officials, you will not be released at this time. Please be advised that medical staff is available 24/7 to address any health issues that you may have during your detention. Once you have exhausted your appeals, Immigration and Customs Enforcement will continue to pursue the issuance of a travel document to facilitate your removal from the United States to Italy. [ICE] will conduct another review of your case in accordance with current regulations. It is in your best interest to maintain proper behavior while awaiting this review." (Docket No. 4-3). That is the entirety of the custody decision.

On March 10, 2009, petitioner's counsel moved for expedited hearing and oral argument based upon allegations of petitioner's deteriorating health.

On March 20, 2009, an expedited hearing and oral argument were held before the undersigned. As of the hearing, D'Alessandro has been in DHS/ICE custody since November 27, 2007, meaning that his detention has lasted sixteen (16) months, ten (10) months longer than the

presumptively reasonable six-month period identified by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001).

At the hearing, respondents called one witness, Dr. Brenda Bradley, the Clinical Medical Director of the Federal Detention Facility in Batavia, New York ("the Batavia FDF"), since March 1998. Dr. Bradley testified that the FDF's medical unit is "fully operational, 24/7" and has a staff of two physician assistants, two nurse practitioners, and a pharmacy. The only physician is Dr. Bradley. She is responsible for 666 beds at the FDF (two-thirds are reserved for DHS, and one-third for the United States Marshal's Service), which has an daily average population of 580 inmates. Dr. Bradley also is responsible for "other" medical facilities operated by DHS. She testified that the average length of stay at the Batavia FDF is "about 49 days" and confirmed that the average length of stay is less than six months. Dr. Bradley indicated that she first examined D'Alessandro, and reviewed his medical records, on March 11, 2009. To avoid repetition, and for ease of reference, I recount the sum and substance of Dr. Bradley's testimony regarding D'Alessandro's medical problems below, in the portion of the Report and Recommendation to which it is directly relevant.

Due to the urgency of this matter, I believe it is appropriate to issue the within Report and Recommendation without waiting for an official transcript to be prepared. I have relied upon my extensive notes and those taken by my staff at the hearing. To the extent that they vary from the transcript, this Court defers to the transcript.

For the reasons that follow, I strongly recommend finding that DHS's review of D'Alessandro's custody has been grossly defective in constitutional terms, and that its decisions to continue detention have neither been in accordance either with Due Process requirements as

interpreted by *Zadvydas v. Davis* nor in compliance with DHS's own regulations. Furthermore, I recommend finding that DHS's conclusion that D'Alessandro is a flight risk or a danger to the community is patently unreasonable in light of the evidence in the record. Indeed, it is contradicted by the record. Finally, I recommend concluding that D'Alessandro has demonstrated that his detention is illegal under *Zadvydas* in that he has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701, and that respondents have not rebutted that showing. Accordingly, I recommend that the petition be granted unconditionally, and D'Alessandro released immediately pursuant to reasonable conditions of supervision and bond, as determined by DHS, subject to review and oversight by the District Court.

## III.    Discussion

### A.    Jurisdiction

I note at the outset that "the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases." *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (citing 28 U.S.C. § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States")). The Supreme Court in *Zadvydas* noted that various pre-IIRIRA statutory changes "left habeas untouched as the basic method for obtaining review of continued custody after a deportation order had become final." *Id.* (citation omitted). And, while the more recent Congressional enactments limit the circumstances in which judicial review of deportation decisions is available, none applies to "deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority." *Id.* Thus, *Zadvydas* concluded, "[28

U.S.C.] § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention." 533 U.S. at 688.

### B.        The Post-Removal-Period Detention Statute: Title 8 U.S.C. § 1231(a)(6)

"The post-removal-period detention statute is one of a related set of statutes and regulations that govern detention during and after removal proceedings." *Zadvydas v. Davis*, 533 U.S. at 683.  During the pendency of their removal proceedings, "most aliens may be released on bond or paroled." *Id.* (citing 66 Stat. 204, as added and amended, 110 Stat. 3009-585, 8 U.S.C. §§ 1226(a)(2), © (1994 ed., Supp. V)). However, "[a]fter entry of a final removal order and during the 90-day removal period, . . .  aliens must be held in custody." *Id.* (quoting 8 U.S.C. § 1231(a)(2)). After the 90-day removal period has ended, "the Government 'may' continue to detain an alien who still remains here or release that alien under supervision." *Id.* (quoting 8 U.S.C. § 1231(a)(6)).

As D'Alessandro points out, "[t]he Government states that [he] is properly held pursuant to 8 U.S.C. § 1231." Petitioner's Reply Memorandum of Law ("Pet'r Reply") at 4 (Docket No. 8). This position was reiterated by the Government at the expedited hearing and oral argument held in this matter on March 20, 2009. The Government here does not contest that the 90-day removal period has come and gone, as evidenced by its pleadings and statements at the hearing, as well as by its attempt, albeit deficient, to provide the post-removal-period custody reviews required by the Immigration and Naturalization Service (INS) regulations.[3]

---

[3]           These regulations, which will be addressed in greater detail, *infra* in this Report and Recommendation,  "add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90-day removal period expires." 533 U.S. at 683 (quoting 8 C.F.R. § 241.4(c)(1), (h), (k)(1)(I) (2001)) "If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3-month period or soon thereafter," *id.* (citing 8 C.F.R. § 241.4(k)(2)(ii)), at which time "the panel will decide, on the basis of records and a possible personal interview, between still further

### C.   *Zadvydas* and the Constitutionality of Civil Detention

The post-removal-period detention statute at issue in *Zadvydas*, Title 8 U.S.C. §

1231(a)(6) (1994 ed., Supp. V),[4] "applies to certain categories of aliens who have been ordered

removed, namely, inadmissible aliens, criminal aliens, aliens who have violated their

nonimmigrant status conditions, and aliens removable for certain national security or foreign

relations reasons, as well as any alien 'who has been determined by the Attorney General to be a

risk to the community or unlikely to comply with the order of removal.'" *Zadvydas*, 533 U.S. at

689 (quoting 8 U.S.C. § 1231(a)(6)). The statute provides further that "an alien who falls into

one of these categories 'may be detained beyond the removal period and, if released, shall be

subject to [certain] terms of supervision.'" *Id.* (quoting 8 U.S.C. § 1231(a)(6) (1994 ed., Supp.

V)). *See also* Respondent's Memorandum of Law ("Resp't Mem.") at 4-5 (Docket No. 5)

As was the case in *Zadvydas*, "[t]he proceedings at issue here are civil, not criminal, and

[this Court] assume[s] that they are nonpunitive in purpose and effect." *Id.* In *Zadvydas*, the

Supreme Court proceeded from the assumption that, as here, the detention was not for punitive

purposes. Respondents do not, and cannot attempt to argue here that the instant matter is

criminal or that the detention may before the purpose of continuing to exact punitive or

retributive measures against D'Alessandro.

---

detention or release under supervision[,]"*id.* (citing 8 C.F.R. § 241.4(I)). In determining the suitability of release, the
regulations instruct the agency to "consider, for example, the alien's disciplinary record, criminal record, mental
health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as
family ties." *Id.* (citing 8 C.F.R. § 241.4(f)). To authorize release, the INS panel "must find that the alien is not likely
to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release." *Id.* (citing
8 C.F.R. § 241.4(e)). Additionally, "the alien must demonstrate 'to the satisfaction of the Attorney General' that he
will pose no danger or risk of flight." 533 U.S. at 684 (quoting 8 C.F.R. § 241.4(d)(1)). Should the INS panel
decides against release, "it must review the matter again within a year, and can review it earlier if conditions
change." *Id.* (citing 8 C.F.R. §§ 241.4(k)(2)(iii), (v)).

    [4]    *See also* 8 C.F.R. § 241.4(a).

In considering the constitutionality of D'Alessandro's detention in this case it bears

noting the Supreme Court's introductory comments from the seminal case of *Zadvydas*, 533 U.S.

678, regarding the limited tolerance our nation's Constitution has for civil detention:

> *A statute permitting indefinite detention of an alien would raise a serious constitutional problem*. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any "person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment–from government custody, detention, or other forms of physical restraint–lies at the heart of the liberty that Clause protects. *See Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). And this Court has said that government detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, *see United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), or, in certain special and "narrow' nonpunitive "circumstances,' *Foucha*, [504 U.S.], at 80, 112 S.Ct. 1780, where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

*Zadvydas*, 533 U.S. at 690 (stating that "[t]here [wa]s no sufficiently strong special justification

here for indefinite civil detention–at least as administered under th[e] statute") (emphasis

supplied).

Turning to the two rationales proffered by the Government for the civil detention of the

aliens in *Zadvydas*, the Supreme Court found them not to be a "sufficiently strong special

justification here for indefinite civil detention–at least as administered under this statute." 533

U.S. at 691.  The first regulatory goal of INA § 241(a) is to "ensur[e] the appearance of aliens at

future immigration proceedings" and the second, to "[p]revent[ ] danger to the community."

*Id.* (quotation to record omitted). However, the Supreme Court stated, "by definition the first

justification–preventing flight–is weak or nonexistent where removal seems a remote possibility

at best." *Id.*  "[W]here detention's goal is no longer practically attainable, detention no longer

'bear[s][a] reasonable relation to the purpose for which the individual [was] committed.'" *Id.*

(quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)). In D'Alessandro's case, one reasonably could say that whether his removal is "practically attainable" subject to significant dispute, given the unique posture of the two legal proceedings he is pursuing with regard to the criminal conviction that forms the basis for his removal order, and the petition to reopen his BIA proceedings. In other words, as discussed below, this Court believes that his detention has ceased to "bear a reasonable relation to the purpose for which [he] [was] committed." *Id.* (quotation omitted) (alterations added).

Turning to the second statutory justification discussed in *Zadvydas*, and the only one which DHS as offered in its decisions to continue D'Alessandro's custody, "protecting the community" "does not necessarily diminish in force over time." *Id.* at 691. However, and this is of crucial importance for D'Alessandro, the Supreme Court has "upheld preventive detention based on dangerousness only when limited to *specially dangerous individuals* and subject to strong procedural protections." *Id.* (emphasis supplied) (comparing *Kansas v. Hendricks*, 521 U.S. 346, 368 (1997) (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards"), *United States v. Salerno*, 481 U.S. 739, 747, 750-752 (1987) (in upholding pretrial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards) *with Foucha v. Louisiana*, 504 U.S. at 81-83 (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness). Furthermore, where the "preventive detention is of potentially indefinite duration," the Supreme Court has "also demanded that the dangerousness rationale be accompanied by *some other special*

-13-

*circumstance*, such as mental illness, that helps to create the danger." *Id.* (emphasis supplied) (citing *Hendricks*, 521 U.S. at 358, 368). The Supreme Court held in *Zadvydas* that neither securing appearance of the alien or preventing danger to the community are "sufficiently [and] specially strong" justifications–whether taken singly or together–to permit indefinite civil detention under INA § 241(a), 8 U.S.C. § 1231(a). *Id.* at 690-91. Moreover, the record demonstrates that D'Alessandro is neither a danger to the community nor a flight risk, and he has never missed an appearance in his state court criminal proceedings or in his immigration proceedings. Thus, the regulatory justifications offered by the Government in *Zadvydas*, and which the Supreme Court found to be not sufficiently compelling to warrant prolonged civil detention, are not implicated in D'Alessandro's case.

The Government in *Zadvydas* "argue[d] that the statute means what it literally says" in that "[i]t sets no 'limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained.'" *Id.* (quotation to record omitted). Thus, respondents in the instant case argue, "'whether to continue to detain such an alien and, if so, in what circumstances and for how long' is up to the Attorney General, not up to the courts." *Id.* (quotation to record omitted)). In other words, the Government in *Zadvydas* argued, indefinite detention was permitted by the statute. *See id.* The Supreme Court explicitly disagreed. *Id.*; *accord*, *e.g., Ly v. Hansen*, 351 F.3d 263, 269 (6th Cir. 2003) ("While it is true that a removable alien has no right to be in the country, it does not mean that he has no right to be at liberty. *Zadvydas* established that deportable aliens, even those who had already been ordered removed, possess a substantive Fifth Amendment liberty interest, and that the interest was violated by indefinite detention.")

Given its above-discussed precedents concerning civil detention, the Supreme Court found that such an interpretation exposed fatal constitutional flaws in the statute. The Supreme Court further found no "clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed," "whether protecting the community from dangerous aliens is a primary or (as we believe) secondary statutory purpose." 533 U.S. at 697.

The Supreme Court in *Zadvydas* determined to rescue INA § 241(a) from nullification on constitutional grounds by rejecting the Government's "potentially indefinite is okay" argument, and "read[ing]  an implicit limitation into the [8 U.S.C. § 1231(a)(6)]," so as to circumscribe "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.*

 Here, respondents, while acknowledging *Zadvydas*' holding that the statute "does not permit indefinite detention," *id.*,  they seek a reading of the statute that would give it the same effect.

**D.     The Effect of Petitioner's Other Pending Legal Challenges on the Legality of His Continued Detention**

One of respondents' main arguments is that D'Alessandro's continued detention is in accordance with the law since "his own actions are the cause of the delay in his release." Resp't Mem. at 10; *see also id.* at 10-13 (Docket No. 5). Respondent points to the fact that D'Alessandro has filed a petition for review of the BIA's denial of his motion to reopen as well as an application for a stay of removal, both of which remain pending at this time. *Id.* at 11 (citing Declaration of Christopher Jacobs ("Jacobs Decl."), ¶¶14-15 (Docket No. 2); *see also* Exhibits to Respondent's Answer and Return ("Resp' Ex.") (Docket No. 4-3) at pp. 25-40).

Respondents argue that "D'Alessandro's filing of that petition for review along with a motion for stay interrupted the removal process," and "[d]ue to a forbearance policy that is based on an agreement between DHS and the Second Circuit Court of Appeals, DHS was prevented from executing D'Alessandro's removal order on January 2, 2008, as planed." Resp't Mem. at 11 (Docket No. 5).

Respondents further argue that "[b]ecause D'Alessandro's removal has been delayed and effectively stayed by his own actions, he should not be heard to complain about his continued detention." *Id.* at 12 (Docket No. 5) (citing *Archibald v. I.N.S.*, No. CIV.A. 02-0722, 2002 WL 1434391 (E.D. Pa. July 1, 2002) ("Here, Archibald's detention is a direct result of his seeking relief from deportation. "The sole reason that [Archibald] continues to be in the custody of the INS is the fact that he has asked for, and been granted a stay of deportation.") (quoting *Evangelista v. Ashcroft*, 204 F. Supp.2d 405, 409 (E.D.N.Y. 2002) (" The sole reason that Petitioner continues to be in the custody of the INS is the fact that he has asked for, and been granted a stay of deportation."); *Lawrence v. Gonzales*, 446 F.3d 221, 227 (1st Cir. 2006) ("Lawrence's continued detention here occurred pursuant to his own procuring of stays incident to his legal challenges to the removal order; it is beyond dispute that this period of time was necessary to bring about Lawrence's removal, which–now that the current litigation is resolved–is presumably imminent. A remand on the issue of the length of detention, which has not been requested, would be wholly fruitless."); *Marcelus v. I.N.S,*, Civ. A. No. 01-2587, 2002 WL 80301, at *1 (E.D. Pa. Jan. 16, 2002) ("Petitioner cannot secure release from detention which has been prolonged beyond the ninety-day removal period or presumptively reasonable six month period because of a judicial stay entered at his request to block his removal pending

resolution of a habeas petition."); *Copes v. McElroy*, No. 98 CIV. 2589(JGK), 2001 WL 830673, at *6 & n.12 (S.D.N.Y. July 23, 2001) ("In this case, the INS has not effected the petitioner's deportation because her deportation has been stayed pending the resolution of her habeas petition challenging her order of deportation. Thus, although the petitioner has been detained for some time, the INS has not yet had a six month period of time to effect her removal as contemplated in *Zadvydas* and for the parties to demonstrate whether there is a significant likelihood of the petitioner's removal in the reasonably foreseeable future [because her deportation has been subject to stays by the Court of Appeals for the Second Circuit.] Accordingly, the petitioner's request for release in light of the Supreme Court's decision in *Zadvydas* is denied at this time.").

As an initial matter, I note that the district court cases cited by respondents in their Memorandum of Law, and referred to in the preceding paragraph, differ from D'Alessandro's case in that there were formal judicial stays in place, ordered by the relevant Circuit Court of Appeals, and detention was pursuant to 28 U.S.C. § 1226. Pet'r Reply at 7 (Docket No. 8) (citing Resp't Mem. at 12-13 (Docket No. 5). With regard to the Third Circuit case cited by respondents, *Lawrence*, there also were court-ordered stays in place. As petitioner points out, *Lawrence* "opined on a situation where a stay squarely within § 1231(a)(1)(B)(ii) existed." Pet'r Reply at 7 (Docket No. 8). Here, the parties agree that there is no formal, court-ordered stay in place, and respondents do not claim that detention is under INA § 236, 8 U.S.C. § 1226. For instance, respondents state that "[i]f  there were an actual court-ordered stay of removal, D'Alessandro's detention would be pursuant to INA § 236, 8 U.S.C. § 1226, and the start of the removal period would be deferred pursuant to INA § 241(a)(1)(B)(2), 8 U.S.C. § 1231(a)(1)(B)(2))." Resp't Mem. at 11 n.3 (Docket No. 5).

Furthermore, the cases cited by respondents at pages 12-13 of their Memorandum of Law did not engage in any analysis of the issue. Regardless of any deficiency in the analysis, the outcome of these cases effectively was that the petitioner was penalized for pursuing avenues of relief to which he or she was legally entitled, and thus continued detention was the petitioner's own fault. I do not find these cases factually apposite; nor are they binding precedent this Court. Rather, the Court finds persuasive the reasoning of two cases cited by petitioners, *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003), and *Oyedei v. Ashcroft*, 332 F. Supp.2d 747 (M.D. Pa. 2004). Pet'r Reply at 8 (Docket No. 8).

As noted above, there is no formal judicial stay in place. But, even if the Second Circuit ultimately were to enter a formal stay, respondents should not be able to rely on this fact to keep him indefinitely detained. In *Oyedeji*, a case from the Middle District of Pennsylvania, the BIA affirmed the Immigration Judge's ruling against petitioner Oyedeji on January 20, 2000, and on February 22, 2000, Oyedeji, represented by counsel, filed a petition for review with the United States Court of Appeals for the Second Circuit, and requested a stay of removal pending a decision on the petition for review.  No formal action was taken on the request for a stay of removal for approximately four (4) years. The district court in *Oyedeji* noted that according to respondents, the Second Circuit and the United States Attorney's Office had an agreement which "provides that when an alien files a Petition for Review and a request for a stay of removal in the Second Circuit, the Court of Appeals contacts the United States Attorney's Office to obtain an agreement that [DHS/ICE] will not remove the alien from the United States until the Second Circuit renders a decision on the Motion for Stay of Removal."  332 F. Supp.2d at 750 (citation to docket omitted). The Government in *Oyedeji* observed that "the Second Circuit, the United

States Attorney's Office and [DHS/ICE] view the forbearance policy as a binding stay of removal."*Id.* (citation to docket omitted). Respondents in *Oyedeji* maintained that, "in light of this effective stay of removal, the 90-day removal period set forth in 8 U.S.C. § 1231 has been suspended." *Id.*

In July of 2000, a "post-order custody review" of Oyedeji's status was undertaken by DHS/ICE. As has been the case with D'Alessandro, "[n]o interview of Oyedeji occurred in connection with this custody review," and "[i]nstead, only a file review was undertaken." 332 F. Supp.2d at 750.  In *Oyedeji*, DHS/ICE determined that detention should be continued because Oyedeji had failed to provide any documentation of employment prospects should he be released, that he had previously failed to appear for court-ordered proceedings, and that he had not refrained from criminal activity after his initial release from DHS/ICE custody." *Id.* (citation to record omitted).

Oyedeji's detention status was again considered by DHS/ICE in August of 2001. By letter dated August 9, 2001, DHS/ICE informed Oyedeji that he would not be released. Similarly to the situation in D'Alessandro's case, the release-denial letter further informed Oyedeji that it had been determined that his repatriation was feasible upon completion of legal proceedings. (Respondents here note that the Italian consulate has already issued travel documents for D'Alessandro once, but they have expired.). Petitioner Oyedeji was informed that if he believed that his removal was not possible in the reasonably foreseeable future, he could submit evidence in support of a request for reconsideration; however, it did not appear that Oyedeji sought reconsideration of this determination.

According to the district court, DHS/ICE did not review Oyedeji's detention status in

-19-

2002. On November 12, 2002, Oyedeji, represented by counsel, commenced a habeas corpus proceeding to challenge his continuing detention. The habeas petition, citing, *inter alia*, *Patel v. Zemski*, 275 F.3d 299 (3d Cir.2001), *overruled in part by Demore v. Kim*, 538 U.S. 510 (2003), contended that the mandatory detention provision of 8 U.S.C. § 1226© was unconstitutional. In answering the habeas corpus petition, the Government asserted that Oyedeji was not being detained pursuant to the mandatory detention provisions of 8 U.S.C. § 1226(c), but was instead being detained pursuant to 8 U.S.C. § 1231. Respondents further asserted that *Zadvydas v. Davis*, 533 U.S. 678, was inapplicable because the period of time during which removal was to be effected had not run as a consequence of the stay of removal that respondents considered to be in effect. *Oyedeji*, 332 F. Supp.2d at 751.

The magistrate judge in *Oyedeji* agreed with respondents and recommended that relief be denied because (1) the effective stay of removal precluded the running of the 90-day removal period, thereby rendering *Zadvydas* inapplicable; and (2) the file reviews of Oyedeji's detention status satisfied due process, since that Oyedeji "had the opportunity to show that his removal was not possible in the reasonably foreseeable future and that he is taking positive measures to facilitate his removal."*Id.* (citation to record omitted).  Oyedeji objected to the Report and Recommendation, arguing that, because no stay of removal had been entered, the period of time within which removal should have occurred had expired and the continuing detention of Oyedeji was unreasonable.

The district court subsequently (1) agreed with Oyedeji's contention that the agreement between the Second Circuit and the United States Attorney's Office did not suspend the running of the removal period, and (2) further found that Oyedeji was entitled to consideration for release

from confinement in accordance with regulations promulgated at 8 C.F.R. § 241.4, explaining

that "[a]n alien who has filed a petition for review of an order of removal but who has not

received a stay of deportation is subject to the provisions of 8 U.S.C. § 1231. Detention beyond

the removal period may be maintained only upon compliance with applicable process. In the case

of criminal aliens, such as Petitioner, that process is specified in 8 C.F.R. § 241.4. It is evident

that Petitioner has not received such process." *Id.* (citation to record omitted).

Accordingly, the district court in *Oyedeji* granted the petition for writ of habeas corpus

conditionally, with respondent afforded a period of sixty (60) days within which to provide the

post-removal custody process set forth in 8 C.F.R. § 241.4, then to file a status report thereafter.

On January 26, 2004, a DHS/ICE District Director issued a "Decision to Continue Detention

Upon Expiration of Removal Period" with regard to Oyedeji. Significantly, as is the case with

D'Alessandro, consideration for release was limited to a review of the file, including information

Oyedeji had submitted, and no personal interview of hin was conducted. *Oyedeji*, 332 F. Supp.2d

at 752. As the district court observed, the decision to continue detention was based upon

Oyedeji's prior record, including the fact that three bench warrants had been issued for his

failure to appear at criminal proceedings. It was also based upon "a stay of removal," despite the

district court's holding that there was no effective stay of removal at that time. Finally, the

decision noted that Oyedeji had failed to submit "sufficient evidence to show that you have

rehabilitated while you have been incarcerated, and you have not provided sufficient evidence to

show that you would not present a flight risk if you were released." *Id.* (quotation omitted). After

telephonic status conference with counsel, the district court re-opened the case and directed the

filing of memoranda of law addressing the merits of the decision to continue Oyedeji's detention.

*Id.*

Initially, the district court in *Oyedeji* observed that "[p]rolonged detention raises substantial questions of constitutional dimensions." *Id.* (citing *Jabir v. Ashcroft*, No. Civ. A. 03-2480, 2004 WL 60318, at *6 (E.D. La. Jan. 8, 2004)). "'[D]eportable aliens, even those who [have] already been ordered removed, possess a substantive Fifth Amendment liberty interest . . . ." *Id.* (quoting *Ly v. Hansen*, 351 F.3d at 269). Accordingly, the district court in *Oyedeji* stated, "aliens under an order of removal are entitled to an opportunity to be heard on the question of prolonged detention, and they may be kept locked up only if incarceration is justified." *Id.* (citing *Ngo v. INS*, 192 F.3d 390, 397 (3d Cir.1999) ("[C]ase law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal, *if* (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.") (emphasis added by district court in *Oyedji*).

The district court summarized respondents' position to be that petitioner was not entitled to consideration for release under the provisions of § 241.4 while there remained a stay of removal, and that he "is presumed repatriatable for at least 180 days and until he proves otherwise, during this period he is presumed to hold the keys to his cell," and "[a]s such, he lacks standing to complain of his continued detention." *Id.* (quotation to record omitted). Respondents make essentially this same argument in D'Alessandro's case.

Thus, as the district court in *Oyedeji* explained, the premise of respondents' argument "appears to be that *Zadvydas* is limited to those aliens for whom no stay of removal is in place

and the presumptive period for removal has expired." *Oyedeji*, 332 F. Supp.2d at 753. That reading of *Zadvydas* is too narrow; rather, *Zadvydas* "recognized the constitutional implications of prolonged detention for those subject to a valid order of removal." *Id.*[5] According to the district court in *Oyedeji*, "[p]rolonged incarceration for an alien whose potentially meritorious challenge to removal is part of a congested docket[6] is indistinguishable from lengthy incarceration because the alien's native country refuses to issue travel documents," which was the situation in facing the aliens in *Zadvydas*. *Id.*  Furthermore, I note that the REAL ID Act now compels an alien ton challenge his underlying removal proceedings in the circuit courts of appeals. Thus, an alien may no longer consolidate his federal appeals in one proceeding before the district court, and is subject to the dockets, schedules, and delays of two separate courts in two separate actions.

I wholly agree with the district court's conclusion in *Oyedeji* that, "[t]he price for securing a stay of removal should not be continuing incarceration," and that an alien "should not be effectively punished for pursuing applicable legal remedies." *Id.* (citing *Ly*, 351 F.3d at 272). The *Oyedeji* court pointed out that in sustaining the authority of Congress to mandate detention of criminal aliens during administrative removal proceedings, the Supreme Court "stressed that such detention would be only 'for the brief period necessary for their removal proceedings.'"

---

[5]        *Zadvydas* held that the statute authorizing post-removal order detention, "read in light of the Constitution's demands," limits an alien's post-removal period detention to a period reasonably necessary to bring about that alien's removal from the United States. 533 U.S. at 689. The Supreme Court recognized that a period of six months was a presumptively reasonable period of detention, after which the alien was entitled to be heard on whether release should be ordered. *Id.* at 701.

[6]        According to petitioner's counsel in *Oyedeji*, petitions for review of removal orders increased by 300% in 2004 in the Second Circuit. *Id.* (citation to record omitted).  This surely coincides with the enactment of the REAL ID Act and its jurisdiction-stripping provisions.

*Id.* (quoting *Demore v. Kim*, 538 U.S. at 513; and *id.* at 532 (Kennedy, J., concurring) (recognizing that a lawful permanent resident "could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified")). I agree that the "fact that the alien has procured a stay of removal does not undermine the bedrock principle that there must be a 'special justification' outweighing the alien's constitutionally-protected interest in liberty, as well as "adequate procedural protections" to continue incarceration while the alien litigates his claims.'" *Oyedeji*, 332 F. Supp.2d at 754 (quoting *Zadvydas*, 533 U.S. at 690, 691); *see also id.* (quoting *Ly v. Hansen*, 351 F.3d at 272 ("An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him.")). I note that *Ly* was a case involving detention under INA § 236, 8 U.S.C. § 1226; however, it cannot be seriously argued that the foregoing reasoning, and "constitutional requirement of reasonability", is not applicable during both the pre-final-removal-order and post-final-removal phases of alien's immigration proceedings. Thus, I reject respondents' argument that D'Alessandro's applications seeking a stay and petitioning for review justify his continued detention simply because they have a practical effect on his actual removal. As petitioner points out, "[i]n requesting a stay of removal, D'Alessandro only sought to prevent his removal from the country while he challenged his underlying conviction and the BIA's denial of his motion to reopen removal proceedings. D'Alessandro's stay application was not a request to remain incarcerated . . . ." Pet'r Reply at 8-9 (Docket No. 8). Respondents cite no convincing authority that an application for a stay "act[s] as a temporary waiver of constitutional due process protections [so as to] . . . permit [the Government] to forego the statutory and regulatory

-24-

procedures for justifying continued detention." *Id.* at 9 (Docket No. 8). I cannot dismiss

petitioner's assertion that respondents' position veers perilously close "to nothing less than

punishment for utilizing the courts[,]" Pet'r Reply at 9 (Docket No. 8).

Furthermore, the only cases cited by respondents where a stay was not judicially ordered,

but the detainee's conduct in seeking judicial review was said to have contributed to the delay so

as to make the delay not unconstitutional were decided over a decade before *Zadvydas*' landmark

decision. *See Doherty v. Thornburgh*, 943 F.2d 204 (2d Cir. 1991); *Dor v. District Director, INS*,

891 F.2d 997 (2d Cir. 1989) (cited in Resp't Mem. at 12 (Docket No. 5)).[7]

As petitioner points out, "*Zadvydas* was a seminal decision that altered the [legal]

landscape" regarding aliens under post-final-orders of removal. Pet'r Reply at 7 (Docket No. 8).

Respondents' attorney did not dispute this at oral argument. Any doubt that *Zadvydas* marked a

watershed in immigration law is dispelled by he wave of changes to the INA regulations that

---

[7]     Moreover, D'Alessandro's case is poles apart from *Doherty* and *Dor* on the facts. In *Doherty*, the alien had been convicted of murder, and the Second Circuit noted, "[o]ver the course of the last eight years, Doherty has exercised skillfully his rights under the deportation statute, delaying and perhaps preventing the outcome sought by the government. He has resisted deportation when it would result in his return to Great Britain, agreed to deportation when it would not result in his return, and then resumed his resistance to deportation when circumstances changed. Only in the face of the impending elimination of the political offense exception did Doherty seek to expedite the deportation process and, when it appeared that his destination of choice no longer offered a haven from extradition, he sought relief from deportation, once again slowing down the process." 943 F.2d at 211. Although his litigation strategy was "perfectly permissible," the Second Circuit held that he could "not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process." *Id.* In *Dor*, the Second Circuit observed that he had "pursue[d] repeated, unsuccessful appeals of the various administrative decisions that he is statutorily barred from adjustment," and had "come[ ] perilously close to [their prior] admonition [in an earlier case] that '[parties] cannot litigate pretrial matters to the ultimate degree and then rely on the extra time attributable to their practice to claim that the duration of pretrial detention violates due process.'" *Dor*, 891 F.2d at 1003 (quotation omitted). In D'Alessandro's case, the New York Court of Appeals has taken the rather extraordinary step of agreeing to review the denial of a writ of *error coram nobis* from 2000. In all of this Court's time on the bench researching habeas law and New York state court criminal law, it can attest to the affect that *coram nobis* relief is extremely rare to begin with. This Court has never seen the New York Court of Appeals grant discretionary leave in such a matter. Petitioner's attorney represented at oral argument that he has been contacted by numerous practitioners regarding the unusualness of this event. As noted elsewhere in this Report and Recommendation, if D'Alessandro is successful before the New York Court of Appeals, that calls into question the validity of his underlying criminal conviction, which is the sole basis for his deportation.

followed. For instance, petitioner has submitted a report published by DHS noting that "'[t]he

June 2001 U.S. Supreme Court decision reversed the former Immigration and Naturalization

Service's (INS) practice of indefinitely detaining aliens who were difficult to remove but

represented a threat to the community or would likely abscond if released'" and "placed limits

on the federal government's authority to detain aliens . . . ." Pet'r Reply at 7 n.8  (Docket No.

8)(quoting Petitioner's Exhibit ("Pet'r Ex.") H at 3, 5 (Docket No. 7-9)).  Therefore, the Court

recommends finding that the pre-*Zadvydas* cases cited by respondents do not carry the day here

in justifying his continued detention on the basis that he is exercising rights of review to which

he is legally entitled. D'Alessandro should not be banished to a constitutional "no-man's-land"

for this reason.

Finally, I recommend rejecting any attempt by respondents to rely upon 8 U.S.C. §

1231(a)(1)(C) to justify his continued detention by contending that he is "acting to prevent

removal" by challenging the underlying criminal conviction and the BIA's denial of his motion

to reopen. The provision contained in 8 U.S.C. § 1231(a)(1)(C) "extend[s]" the "removal period"

beyond its presumptive 90-day limit if "the alien fails or refuses to make timely application in

good faith for travel or other documents necessary to the alien's departure or conspires or acts to

prevent the alien's removal." 8 U.S.C. § 1231(a)(1)(C). It seems fairly plain to this Court that the

section contemplates acts of obstruction by the detainee that constitute willful refusal to

cooperate with immigration authorities, not efforts to seek legally available judicial remedies.

Other federal courts have come to a similar conclusion. *See*, *e.g.*,  *Prieto-Romero v. Clark*, 534

F.3d 1053, 1061 (9th Cir. 2008) ("Moreover, we are highly skeptical about the government's

suggestion that an alien's attempt to seek judicial relief from deportation constitutes 'conspir[ing]

or act[ing] to prevent [his] removal.'") (quoting 8 U.S.C. § 1231(a)(1)(C)). As examples of such

behavior, the Ninth Circuit pointed to an alien willfully refusing to cooperate with the

government in processing his deportation papers. *Id.* (citing *Lema v. INS*, 341 F.3d 853, 856 (9th

Cir.2003) (alien refused to "cooperate fully and honestly with officials to secure travel

documents"); *Pelich v. INS*, 329 F.3d 1057, 1059 (9th Cir.2003) (alien refused to fill out passport

application)). However, "[s]uch acts of obstruction [we]re clearly of a different nature than an

alien's attempt to make use of legally available judicial review and remedies." *Id. Accord*, *e.g.*,

*Abdel-Muhti v. Ashcroft*, 314 F. Supp.2d 418,. 428 (M.D. Pa. 2004).

   **E.    DHS/ICE's Failure to Comply With Their Own Regulations and Failure
           Provide Legally-Required Procedures Violate Petitioner's Right to
           Procedural Due Process**

   As petitioner points out, three sections of immigration regulations relating to the removal

of aliens are applicable here: 8 C.F.R. § 241.4; 8 C.F.R. § 241.13; and 8 C.F.R. § 241.14. *See*

Pet'r Reply at 10 (Docket No. 8). These regulations were either amended, or promulgated in the

first instance, as a result of *Zadvydas*.  Pet'r Reply at 10 (Docket No. 8) (citing Resp't Mem. at 7

(Docket No. 5)).  I turn first to petitioner's claim that the Government actually failed to provide

certain statutorily-mandated procedures to D'Alessandro. *See* Pet'r Reply at 10-16 (Docket No.

8).

   Under 8 C.F.R. § 241.4, DHS/ICE has authority to release any detainee if determines that

"his . . . release will not pose a danger to the community or to the safety of other persons or to

property or a significant risk of flight pending such alien's removal from the United States." 8

C.F.R. § 241.4(d)(1). Where, as here, a detainee is detained beyond the 90-day removal period,

"the Deputy Executive Associate Commissioner for Detention and Removal, the Director of the

Detention and Removal Field Office or the district director may continue an alien in custody

beyond the removal period described in section 241(a)(1) of the Act [8 U.S.C. § 1231(a)]

pursuant to the procedures described in this section [8 C.F.R. § 241.4]." 8 C.F.R. § 241.4(a).

After the 90-day removal period elapses, and if the detainee has not been removed within

the next three (3) months, there must be a review and custody determination by the Executive

Associate Commissioner ("EAS"), acting through the Headquarters Post-order Detention Unit

("HQPDU").  Pet'r Reply at 12 (Docket No. 8) (citing 8 C.F.R. § 241.4(c)(2) ("For any alien the

district director refers for further review after the removal period, or any alien who has not been

released or removed by the expiration of the three-month period after the review, all further

custody determinations will be made by the Executive Associate Commissioner, acting through

the HQPDU.")). This 180-day review by the EAS must comply occur in accordance with the

follow procedures: Determinations by the Executive Associate Commissioner. "Determinations

by the Executive Associate Commissioner to release or retain custody of aliens shall be

developed in accordance with the following procedures," 8 C.F.R. § 241.4(I):

> (1) Review panels. The HQPDU Director shall designate a panel or panels to
> make recommendations to the Executive Associate Commissioner. A Review
> Panel shall, except as otherwise provided, consist of two persons. Members of a
> Review Panel shall be selected from the professional staff of the Service. All
> recommendations by the two-member Review Panel shall be unanimous. If the
> vote of the two-member Review Panel is split, it shall adjourn its deliberations
> concerning that particular detainee until a third Review Panel member is added.
> The third member of any Review Panel shall be the Director of the HQPDU or his
> or her designee. A recommendation by a three-member Review Panel shall be by
> majority vote.
> (2) Records review. Initially, and at the beginning of each subsequent review, the
> HQPDU Director or a Review Panel shall review the alien's records. Upon
> completion of this records review, the HQPDU Director or the Review Panel may
> issue a written recommendation that the alien be released and reasons therefore.
> (3) Personal interview.
> (I) If the HQPDU Director does not accept a panel's recommendation to grant

release after a records review, or if the alien is not recommended for release, a Review Panel shall personally interview the detainee. The scheduling of such interviews shall be at the discretion of the HQPDU Director. The HQPDU Director will provide a translator if he or she determines that such assistance is appropriate.

(ii) The alien may be accompanied during the interview by a person of his or her choice, subject to reasonable security concerns at the institution's and panel's discretion, who is able to attend at the time of the scheduled interview. Such assistance shall be at no expense to the Government. The alien may submit to the Review Panel any information, in English, that he or she believes presents a basis for his or her release.

(4) Alien's participation. Every alien shall respond to questions or provide other information when requested to do so by Service officials for the purpose of carrying out the provisions of this section.

(5) Panel recommendation. Following completion of the interview and its deliberations, the Review Panel shall issue a written recommendation that the alien be released or remain in custody pending removal or further review. This written recommendation shall include a brief statement of the factors that the Review Panel deems material to its recommendation.

(6) Determination. The Executive Associate Commissioner shall consider the recommendation and appropriate custody review materials and issue a custody determination, in the exercise of discretion under the standards of this section. The Executive Associate Commissioner's review will include but is not limited to consideration of the factors described in paragraph (f) of this section. Before making any decision to release a detainee, the Executive Associate Commissioner must be able to reach the conclusions set forth in paragraph (e) of this section. The Executive Associate Commissioner is not bound by the panel's recommendation.

8 C.F.R. § 241.(i)(1)-(6). A copy of the 180-day determination must be written, and must set forth the reasons for the EAS's decision. 8 C.F.R. § 241.4(d). If release is determined to be appropriate, the Government may impose various conditions to guarantee the detainee's future appearance and prevent risk to the community. *See* 8 C.F.R. § 241.4(j) ("The district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner shall impose such conditions or special conditions on release as the Service considers appropriate in an individual case or cases, including but not limited to the conditions of release noted in 8 CFR

212.5(c) and § 241.5.[8] An alien released under this section must abide by the release conditions specified by the Service in relation to his or her release or sponsorship.").

Petitioner asserts, and respondents do not dispute, that D'Alessandro has never received the required 180-day review under 8 C.F.R. § 241.(c)(2). Pet'r Reply at 12-13 (Docket No. 8) ("Here, the undisputed and dispositive facts are: no 180 day review occurred whatsoever, no review or determination occurred ever by the Executive Associate Commissioner or his designee, no required review panel existed, and no personal interview took place."). I agree with petitioner that "the Government in recounting the reviews afforded by DHS does not claim that the 180 day review occurred or was not required." Pet'r Reply at 13 (Docket No. 8). As

---

[8]        8 C.F.R. § 241.5 delineates conditions of release after the removal period:

(a) Order of supervision. An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision. The Commissioner, Deputy Commissioner, Executive Associate Commissioner Field Operations, regional director, district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer-in-charge may issue Form I-220B, Order of Supervision. The order shall specify conditions of supervision including, but not limited to, the following:
           (1) A requirement that the alien report to a specified officer periodically and
           provide relevant information under oath as directed;
           (2) A requirement that the alien continue efforts to obtain a travel document and
           assist the Service in obtaining a travel document;
           (3) A requirement that the alien report as directed for a mental or physical
           examination or examinations as directed by the Service;
           (4) A requirement that the alien obtain advance approval of travel beyond
           previously specified times and distances; and
           (5) A requirement that the alien provide the Service with written notice of any
           change of address on Form AR-11 within ten days of the change.
(b) Posting of bond. An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.
(c) Employment authorization. An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that: (1) The alien cannot be removed in a timely manner; or
(2) The removal of the alien is impracticable or contrary to public interest.

8 C.F.R. § 241.(5). As this Court discusses further below, respondents cannot seriously argue that petitioner, given his character references, spotless, indeed exemplary, institutional record, serious health problems, and strong and enduring family support and community ties, would not comply with any of the foregoing conditions.

petitioner points out, this is the "critical six-month review" (90-day removal period plus three

months), "included specifically due to the constitutional requirements of *Zadvydas*," which held

that detention is presumptively reasonable only for a period of six months following a final order

of removal. Pet'r Reply at 13 (Docket No. 8); *see Ly v. Hansen*, 351 F.3d at 276 ("The Supreme

Court [in *Zadvydas*] set a presumptive standard of 90 days and an outside limit of six months

detention for aliens who have been ordered removed absent a showing of a 'strong special

justification' for detention.") (citing *Zadvydas*, 533 U.S. at 690, 701).

At the March 20th oral argument, I asked respondents' attorney whether she agreed that

DHS/ICE is required to follow its own procedures. She agreed. However, respondents' attorney

had no meaningful answer as to why the 180–day review had not occurred, and offered no

justification or response to petitioner's attorney's arguments that DHS/ICE has not followed its

own regulations. Petitioner has submitted an internal report of a DHS audit titled, "ICE's

Compliance With Detention Limits for Aliens With a Final Order of Removal From the United

States"("the DHS report"), indicating serious problems in ICE's compliance with the review

procedures and time-lines mandated by the immigration regulations. *See generally* DHS Report

at 7-19 (Docket No. 7-9).[9]

---

[9]        *See also* DHS Report at 10 (Docket No. 7-9) ("Specifically, cases are not prioritized to ensure that
aliens who are dangerous."); *id.* at 10 ("[T]here are weaknesses and potential vulnerabilities in the POCR [180-day]
process that cannot be easily addressed with ICE's current oversight efforts. These deficiencies will directly affect
ICE's ability to manage the projected growth in its caseload caused by DHS' planned enhancements to secure the
border as envisioned with the Secure Border Initiative, the end of 'catch-and-release' practices, and an increase in
interior enforcement programs. . . . Moreover, procedures for managing post-180 day cases are inadequate,
particularly when ICE has concluded that there is a significant likelihood of removing the alien in the foreseeable
future, or that the alien is not cooperating."); *id.* at 14 ("We determined that post-order custody reviews were not
consistently complete or timely. While the HQCDU has developed and posted on its website extensive guidance, not
all field offices visited were using the materials. The most serious consequence was that some detainees were
deemed to have failed to comply, and therefore removed from the POCR process, without sufficient justification. . . .
Of the 210 alien files we examined, 82 were eligible for a post-order custody review. We determined that 11 of these
82 aliens had not received a 90-day post-order custody review, and 3 had not received either a 90-day or 180-day
review. . . .") (Docket No. 7-9).

As petitioner points out, in the fifteen (15) months of his incarceration, D'Alessandro has

received only two (2) detention decisions, both of which were titled "Decision to Continue

Detention." The first was the 90-day review in February 2008 (Pet'r Ex. B, Docket No. 7-3). On

February 19, 2008, Charles Mule, Acting Field Office Director, issued the Decision to Continue

Detention, stating that D'Alessandro had "failed to demonstrate that there is no significant like

hood [sic] of your repatriation in the foreseeable future, pending the 2nd Circuit issues [sic] a

decision on your case." Decision to Continue Detention dated 2/19/08 (Pet'r Ex. B, Docket No.

7-3); *see also* Docket No. 4-3. This decision was "made based on a review of your file and

consideration of information you submitted to ICE's reviewing officials." *Id.* (Docket No. 7-3,

Docket No. 4-3).

According to 8 C.F.R. § 241.4(c)(2), the 180-day review should have occurred sometime

in May 2008, which was three months after the 90-day period. Pet'r Reply at 13 (Docket No. 8)

(citing 8 C.F.R. § 241.4(c)(2)). However, no review occurred at that time. In fact, it appears that

DHS/ICE did not look at D'Alessandro's detention status until petitioner's counsel sent a

lengthy and comprehensive letter on October 20, 2008, detailing the unique circumstances of

D'Alessandro's case. Counsel noted the length of his detention and its indefinite nature, his

compelling family circumstances, the lack of flight risk or threat to the public safety. *See* Docket

No. 4-3; *see also* Pet'r Ex. C. Counsel requested that DHS review his file and release him from

detention. In an undated letter, Martin Herron of DHS denied counsel's request for release based

"[u]pon the totality of information involved in this case," stating that "[t]here is no appeal to this

decision." Undated Letter from Martin Herron (Docket No. 4-3); *see also* Pet'r Ex. D, Docket

No. 7-5); *see also* Pet'r Reply at 13 (Docket No. 8). Petitioner's attorney indicates that he

received the letter in November 2008. Pet'r Reply at 13 (Docket No. 8).

On January 14, 2009, one year after the initial 90-day review, DHS provided petitioner's counsel with a "Notice to Alien to File Custody Review" ("Notice Dated 1/14/09"). Pet'r Reply at 14  (Docket No. 8) (citing Pet'r Ex. E, Docket No. 7-6). The Notice indicated that D'Alessandro's custody status would "be reviewed on or about 2/15/09."  Notice Dated 1/14/09 (Docket No. 7-6). Petitioner points out the Notice incorrectly states that "[r]elease . . . is dependent on your demonstrating by 'clear and convincing evidence' that you will not pose a danger to the community and will not be a significant flight risk. You must also demonstrate that a travel document is not available in the reasonable [sic] foreseeable future to effect your removal from the United States." *Id.* (Docket No. 7-6). The DHS Report notes that "[f]our field offices were using a version of the Notice to Alien of File Custody Review that used the standard–'clear and convincing evidence that [the alien] will not pose a danger to the community and will not be a significant flight risk'–drawn from pre-*Zadvydas* regulations." DHS Report at 18 (Docket No. 7-9). The "accurate" legal standard, explains the DHS Report, is "evidence . . . 'to the satisfaction of the Attorney General' that the detainee 'will not pose a danger to the community and will not present a flight risk[.]'" DHS Report at 18 (Docket No. 7-9); *see also* 8 C.F.R. § 241.4(d)(1) ("Showing by the alien").

In addition, the DHS Report states, "the HQCDU provides clear guidance on the elements that must be included in the 90-day denial letter provided to aliens[:] the case history; a criminal history, if convicted; and evaluation of the release criteria; and a decision specific to the alien's circumstances." DHS Report at 18 (Docket No. 7-9). The 90-day decision, issued in February 2008, provided a case history and criminal history, but utterly failed conduct any

evaluation of the release criteria. The regulations, at 8 C.F.R. § 241.4(e), set forth the following

"Criteria for release":

> (1) Travel documents for the alien are not available or, in the opinion of the
> Service, immediate removal, while proper, is otherwise not practicable or not in
> the public interest;
> (2) The detainee is presently a non-violent person;
> (3) The detainee is likely to remain nonviolent if released;
> (4) The detainee is not likely to pose a threat to the community following release;
> (5) The detainee is not likely to violate the conditions of release; and
> (6) The detainee does not pose a significant flight risk if released.

8 C.F.R. § 241.4(e)(1)-(6). "Before making any recommendation or decision to release a

detainee, a majority of the Review Panel members, or the Director of the HQPDU in the case of

a record review," "must conclude" that these criteria have been fulfilled. The regulations are

conspicuously ambiguous as to what degree of certainty the Government "must conclude" that

these criteria have been shown. However, as noted above, the "accurate" legal standard for the

showing required by the alien, explains the DHS Report, is "evidence . . . 'to the satisfaction of

the Attorney General' that the detainee 'will not pose a danger to the community and will not

present a flight risk[.]'" DHS Report at 18 (Docket No. 7-9); *see also* 8 C.F.R. § 241.4(d)(1)

("Showing by the alien"). The DHS Report also makes clear that "clear and convincing

evidence" is not the proper standard. DHS Report at 18 (Docket No. 7-9). Thus, the Attorney

General must be satisfied with something less than "clear and convincing evidence." *See id.*

     In addition, "[t]he district director's or Director of the Detention and Removal Field

Office's review *will include* but is not limited to consideration of the factors described in

paragraph (f) of this section [8 C.F.R. § 241.4(f)] Before making any decision to release a

detainee, the district director must be able to reach the conclusions set forth in paragraph (e) of

this section [8 C.F.R. § 241.4(e)]." 8 C.F.R. § 241.4(3) ("Factors for consideration") (emphasis

supplied).  The factors that the review "will include" are as follows:

> (1) The nature and number of disciplinary infractions or incident reports received when incarcerated or while in Service custody;
> (2) The detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history;
> (3) Any available psychiatric and psychological reports pertaining to the detainee's mental health;
> (4) Evidence of rehabilitation including institutional progress relating to participation in work, educational, and vocational programs, where available;
> (5) Favorable factors, including ties to the United States such as the number of close relatives residing here lawfully;
> (6) Prior immigration violations and history;
> (7) The likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes, failures to appear for immigration or other proceedings, absence without leave from any halfway house or sponsorship program, and other defaults; and
> (8) Any other information that is probative of whether the alien is likely to–
>> (i) Adjust to life in a community,
>> (ii) Engage in future acts of violence,
>> (iii) Engage in future criminal activity,
>> (iv) Pose a danger to the safety of himself or herself or to other persons or to property, or
>> (v) Violate the conditions of his or her release from immigration custody pending removal from the United States.

8 C.F.R. § 241.4(f)(1)-(8).

In this case, February 2008 decision states only that D'Alessandro "failed to demonstrate that there is no significant like hood [sic] of your repatriation in the foreseeable future, pending the 2nd Circuit issues [sic] a decision on your case." Decision to Continue Detention dated 2/19/08 (Pet'r Ex. B, Docket No. 7-3); *see also* Docket No. 4-3. Notwithstanding the assertion that the decision was "made based on a review of your file and consideration of information you submitted to ICE's reviewing officials," *Id.* (Docket No. 4-3), there is no serious way that this can be read as a "decision specific to the alien's circumstances," DHS Report at 18 (Docket No. 7-9), when there is literally no discussion whatsoever of D'Alessandro's circumstances. Nor did

it contain any discussion of the release criteria (8 C.F.R. § 241.4(e) or relevant factors for

consideration (8 C.F.R. § 241.4(f)), as required by the regulations.

The February 11, 2009 decision to continue custody, issued by Martin Herron, Field

Office Director, also has procedural deficiencies. *See* Decision to Continue Custody dated

2/11/2009 (Docket Nos. 7-8 & 4-3). The decision states that release is denied based upon a

"review of your file and/or your personal interview and consideration of any information you

submitted to ICE's reviewing officials." *Id.* (Docket Nos. 7-8 & 4-3). After reviewing the

underlying conviction and immigration proceedings, the decision states: "Your criminal history

includes convictions for kidnapping [sic] with intent to collect ransom, attempted robbery-1st,

Assault with intent to cause bodily injury, attempted grand larceny-2nd and coercion. These

convictions are considered severe in nature making you a threat to the community and a flight

risk. Because of this history of disregard for the laws and order of the United States and its

officials, you will not be released at this time. Please be advised that medical staff is available

24/7 to address any health issues that you may have during your detention. Once you have

exhausted your appeals, Immigration and Customs Enforcement will continue to pursue the

issuance of a travel document to facilitate your removal from the United States to Italy. [ICE]

will conduct another review of your case in accordance with current regulations. It is in your best

interest to maintain proper behavior while awaiting this review." *Id.* (Docket Nos. 7-8 & 4-3).

That is the entirety of the custody decision. Again, there is no specific mention or even allusion

to the release considerations set forth in 8 C.F.R. § 241.4(e) or the factors for consideration set

forth in 8 C.F.R. § 241.4(f). Like the February 2008 decision to continue custody, the February

2009 decision cannot seriously be viewed as "specific to the alien's circumstances," DHS Report

-36-

at 18 (Docket No. 7-9), when there is no reference at all to the particular circumstances of D'Alessandro's, apart from his criminal history.

In addition, petitioner points out, the February 11, 2009 decision to continue custody apparently not made by an authorized person under the regulations. After 180 days, the authority to make custody determinations is vested in the Executive Associate Commissioner ("EAS"). Pet'r Reply at 15 (Docket No. 8) (citing 8 C.F.R. § 241.4(c)(2) ("For . . . any alien who has not been released or removed by the expiration of the three-month period after the review, all further custody determinations will be made by the Executive Associate Commissioner, acting through the HQPDU."); 8 C.F.R. § 241.4(c)(1) ("The initial custody determination described in paragraph (h) of this section and any further custody determination concluded *in the 3 month period immediately following the expiration of the 90-day removal period*, subject to the provisions of paragraph (c)(2) of this section, will be made by the district director or the Director of the Detention and Removal Field Office having jurisdiction over the alien.") (emphasis supplied);  8 C.F.R. § 241.4(d)(2)(ii). The February 11, 2009 decision was made by Martin Herron, describing himself as the "Field Office Director, DRO/Designated Representative. The EAS may "designate[ ] in writing" a person to act on his or her behalf, but its unclear whether Herron was so designated.

It should be clear that the foregoing discussion does not relate to whether this Court believes the DHS's procedural requirements, set forth in its regulations, comport with the requirements of due process. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due

process of law." *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). Rather, here I take issue with

DHS's having ignored the regulations it promulgated, a number of which were amended to

comply with the Supreme Court's due process requirements in *Zadvydas*. "It is central to our

concept of due process that government officials, no less than private citizens, are bound by rules

of law." *Bonitto v. Bureau of Immigration and Customs Enforcement*, 547 F. Supp.2d 747, 757

(S.D. Tex. 2008) (citing *Government of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir.1970)

(holding that it is a denial of procedural due process for any government agency to fail to follow

its own regulations providing procedural safeguards to persons involved in adjudicative

processes before it).

The Supreme Court has made clear in *Zadvydas* that government detention violates Due

Process Clause unless detention is ordered in criminal proceeding with adequate procedural

protections, or there is special justification, such as harm-threatening mental illness, which

outweighs the individual's constitutionally protected interest in avoiding physical restraint.

*Zadvydas*, 533 U.S. at 699-700. In response to *Zadvydas*, the regulations governing

post-removal-order detention of aliens were amended to comply with the due process concerns

illuminated in *Zadvydas*. The amended regulations, 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13, were

drafted "to reflect the concerns of the *Zadvydas* Court and provide necessary procedural

safeguards to ensure the detention of an alien beyond the removal period comports with due

process requirements[;] [b]ecause these regulations confer important rights upon aliens ordered

removed, DHS is bound by these regulations." *Bonitto*, 547 F. Supp.2d at 757. As the district

court pointed out in *Bonitto*, "[t]he [immigration] regulations involved here do not merely

facilitate internal agency housekeeping, but rather afford important and imperative procedural

-38-

safeguards to detainees." *Id.* (citing *United States v. Caceres*, 440 U.S. 741, 759, 760 (1979) ("This Court has consistently demanded governmental compliance with regulations designed to safeguard individual interests even when the rules were not mandated by the Constitution or federal statute.") (citing, *inter alia*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1967) ("The clear import of broad provisions for a final review by the Attorney General himself would be meaningless if the Board were not expected to render a decision in accord with its own collective belief. In unequivocal terms the regulations delegate to the Board discretionary authority as broad as the statute confers on the Attorney General; the scope of the Attorney General's discretion became the yardstick of the Board's. And if the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience. This applies with equal force to the Board and the Attorney General. In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner."); *Bridges v. Wixon*, 326 U.S. 135, 143 (1945) (vacating a deportation order because the Immigration and Naturalization Service had failed to observe regulations requiring that witness statements be made under oath, even though the petitioner's statements were not involved and he had not invoked the regulations at his deportation hearing)).[10]

---

[10] *See also United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519 (D.C. Cir.1978) ("In *Vermont Yankee* [*Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519 (1978),]" the Supreme Court held that, absent constitutional constraints or extremely compelling circumstances, administrative agencies should be free to fashion their own rules of procedure. "). However, as the D.C. Circuit Court of Appeals explained, "[t]he freedom of administrative agencies to fashion their procedures recognized in *Vermont Yankee*, . . . does not encompass freedom to ignore statutory requirements. The [Supreme Court in] *Vermont Yankee* Court . . . careful to point out that '[o]f course, the court must determine whether the agency complied with the procedures mandated by the relevant statutes.'" *Id.*, 584 F.2d at 543 n. 63 (citing *Vermont Yankee*, 435 U.S. at 549) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)); *see also* 584 F.2d at 541 ("That the proceedings in this case did not, because of the Ex parte contacts, amount to the 'hearing' guaranteed by statute is patently clear. While the Commission enjoys substantial flexibility in structuring its hearings in light of the issues involved, the requirement

In *Bonitto*, the magistrate judge found that DHS has failed to comply with its own custody-review procedures; as is the case here, in *Bonitto* there was "no evidence in the record to show that ICE has conducted a 180-day custody review," which was due by December 21, 2007; at the time of the decision in *Bonitto*, "more than nine months, or 270 days, have elapsed since Bonitto's removal period began and he has still not received the POCR [post-order custody review] required after 180-days of post-removal-order detention." 547 F. Supp.2d at 757.  In *Bonitto*, 90-day post-order custody review "occurred almost two months late and contain[ed] little basis for the decision to continue detention." As the district court noted, "[i]n making the 90-day custody determination, ICE must consider its ability to obtain travel documents for the alien," 8 C.F.R. § 241.4(g)(3), and its "decision to continue custody 'shall briefly set forth the reasons for the continued detention,'" *id.* (quoting 8 C.F.R. § 241.4(d)).  Similarly to D'Alessandro's case, "neither the recommendation to continue detention by Bonitto's deportation officer nor the notice provided to Bonitto to inform him of ICE's decision to continue his detention states any factual grounds or bases for the decision," "merely inform[ing] Bonitto that 'it has been determined that you will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE) at this time.'" *Id.* (noting that custody recommendation stated, "in its entirety, [that] '[a]fter careful review of the subject's A-file and documentation listed above, it is the opinion of this Officer that the subject is kept in detention. This Officer believes that if released to the general public he will pose a danger to society. Subject has convictions involving sale drugs, his removal from the U.S. is expected to be effected with in the reasonable foreseeable future therefore I recommend continued detention.' (sic).").  Similarly to

---

of a hearing to determine the public interest means, at a very minimum, that an opportunity must be afforded for meaningful public participation. In this case there was no such opportunity.").

D'Alessandro's case, the alien's record in *Bonitto* did not support a finding that he was a danger

to society; one deportation officer "determined that Bonitto did not appear to be specially

dangerous or likely to be violent in the future, such as would justify continued detention

regardless of the likelihood of removal in the foreseeable future under 8 C.F.R. § 241.14(f)." *Id.*

(citation to record omitted). The magistrate judge found this to be further evidence DHS/ICE had

failed to comply with its own custody-review procedures. 547 F. Supp.2d at 757. Accordingly,

the *Bonitto* court found that "by failing to afford Bonitto the required 180-day review, DHS has

failed to provide Petitioner with the procedural safeguards contained in the regulations

implementing the post-removal-order detention statute. DHS cannot constitutionally detain

Bonitto without complying with these safeguards, regardless of the fact that Bonitto [had] not

here meet his burden under *Zadvydas*." *Id.* at 758.[11] Thus, the magistrate judge recommended

affording DHS a period of time within which to provide petitioner "a meaningful post-removal

custody review, as contemplated in 8 C.F.R. §§ 241.4 and 241.13," and recommended that such

process were not provided, petitioner "released unless his removal has been effectuated by that

time." *Id.*

 In addition to failing to provide D'Alessandro with certain procedures guaranteed by the

regulations, e.g., the 180-day review, DHS/ICE's custody decisions contain glaring deficiencies

with regard to consideration of the required release factors. When I raised this at oral argument,

---

[11]     The court in *Bonitto* was troubled by DHS's "lackluster" attempt to convince it the habeas petition
should be dismissed, but found that Bonitto had alleged some evidence, but not alleged sufficient evidence as
required for the burden to shift to the DHS under *Zadvydas*. The "some evidence" petitioner pointed to show that his
removal was unlikely was "evidence of his full cooperation with ICE authorities to aid in his removal and the
expiration of the 6-month presumptively reasonable period."  However, *Zadvydas* stated that the "6-month
presumption, of course, does not mean that every alien not removed must be released after six months." 533 U. S. at
701. With such a sparse record, the district court found that Bonitto's claim under *Zadvydas* "cannot succeed at this
juncture." 547 F. Supp.2d at 755. As noted, the district court recommended granting the petition on other grounds
and holding a status conference to follow up on DHS's efforts at compliance with the custody review regulations.

respondents' attorney asserted that the decisions to continue detention were "a summary" and were not meant to include all factors considered by DHS/ICE. Respondents' attorney also contended DHS/ICE's failure to mention them specifically does not mean that they were not considered. However, a comparison of all of the factors set forth in the regulations against the complete record on D'Alessandro available to DHS/ICE leads to but one conclusion–that D'Alessandro "has not received meaningful consideration for release," *Oyedeji v. Ashcroft*, 332 F. Supp.2d 747, 752 (M.D. Pa. 2004), as "[t]he record does not show that [DHS/]BICE has applied to [petitioner] the provisions of 8 C.F.R. § 241.4," *id.*, which regulation, "governing continued detention of criminal aliens 'beyond the removal period,' requires periodic personal interviews of the alien, an opportunity that has not been accorded to [him]," *id.* (citing 8 C.F.R. § 241.4(*l*)(3)).

At the hearing on March 20, 2009, I read into the record all of the factors and considerations set forth in 8 C.F.R. § 241.4, and noted that it appeared to me that there was an "utter failure" on DHS/ICE's part to have properly processed a release pending removal, given the relevant factors overwhelmingly favor D'Alessandro's release. These factors have been exhaustively detailed and cogently presented to DHS by petitioner's counsel. *See* Letter of Brian Gardner, Esq., dated October 20, 2008 (Docket No. 7-4) and Letter of Brian Gardner, Esq., dated February 10, 2009 (Docket No. 7-7). Indeed, as I stated at the hearing, I do not see *any* analysis of the regulation's required factors in any of DHS/ICE's decisions, let alone any indication that they reviewed the information already in D'Alessandro's file or specially submitted by petitioner's attorney directly to DHS/ICE.

Turning to the first release consideration articulated in 8 C.F.R. § 241.4(e), respondents

cannot dispute that "[t]ravel documents for the alien are not available or, in the opinion of the

Service, immediate removal, while proper, is otherwise not practicable or not in the public

interest." 8 C.F.R.§ 241.4(e)(1). Even if the travel documents issued by the Italian consulate

were still available, removal is "otherwise not practicable" due to the informal forbearance

policy in place between the Second Circuit and DHS that effectively prevents D'Alessandro's

deportation at this time.

Second, all of the evidence in the record supports the conclusion that the "detainee is

*presently* a non-violent person." 8 C.F.R. § 241.4(e)(2) (emphasis supplied).  Here, it is apparent

that DHS/ICE has simply taken petitioner's decades-old criminal conviction and concluded that

he is a present danger to society. "[W]here, as here, detention becomes prolonged, 'special care

must be exercised so that the confinement does not continue beyond the time when the original

justifications for custody are no longer tenable.'" *Oyedeji*, 332 F. Supp.2d at 754 (quoting *Ngo v.

INS*, 192 F.3d 397, 398 (3d Cir. 1999) and citing *Zadvydas*, 533 U.S. at 690 (stating that

"government detention violates th[e] [Due Process] Clause unless the detention is ordered in a

criminal proceeding with adequate procedural protections, or, in certain special and 'narrow'

non-punitive 'circumstances,' where a special justification, such as harm-threatening mental

illness, outweighs the 'individual's constitutionally protected interest in avoiding physical

restraint'"). In these deportation and removal cases, "'[]he stakes are high and . . . grudging and

perfunctory review is not enough to satisfy the due process right to liberty . . . .'" *Id.* (quoting

*Ngo*, 192 F.3d at 398). "The assessment of flight risk and danger to the community must be made

on a current basis," *id.* (citing *Ngo*, 192 F.3d at 398), and "'[t]o presume dangerousness to the

community and risk of flight based solely on [an alien's] past record does not satisfy due

process,'" *id.* (quoting 192 F.3d at 398-99). Thus, the district court in *Oyedeji* held,

> Other than the petit larceny convictions and the issuance of bench warrants,
> Respondents have pointed to no evidence that would support a determination that
> Oyedeji is a danger to the community or such a flight risk that no conditions of
> supervision could assure his presence in the event that his petition for review is
> unsuccessful. A consideration of the criteria for release listed in 8 C.F.R. §
> 241.4(e) supports a decision favorable to Oyedeji. Specifically, travel documents
> for Oyedeji are not available because of the stay of removal; Oyedeji appears to
> be a non-violent person and likely to remain so if released; and the petit larceny
> offenses hardly pose a threat to the community. In terms of the factors for
> consideration of release set forth in § 241.4(f), Oyedeji does not have any
> disciplinary infractions or incident reports while incarcerated or in DHS/ICE
> custody; his criminal convictions are not for serious offenses; there is no evidence
> of any mental health problems or refusal to participate in work, educational or
> vocational programs while incarcerated; his mother and siblings reside in the
> United States; and there is no evidence of a history of escapes.
> In short, only a criminal record that is now more than seven years old supports a
> decision to continue detention. "Due process is not satisfied . . . by rubberstamp
> denials based on temporally distant offenses." *Ngo*, 192 F.3d at 398. Accordingly,
> release from confinement, subject to appropriate conditions of supervision, is
> mandated in this case.

*Oyedeji*, 332 F. Supp.2d at 754.

Similarly, DHS relied solely upon D'Alessandro's years-old conviction for crimes

(kidnaping and assault) which it statutorily has defined as "aggravated felonies." These are

charges to which he was originally offered a plea to probation *only*–no jail time. Although

D'Alessandro was represented by counsel (not habeas counsel), he rejected that offer, perhaps

because he wanted to prove his innocence. D'Alessandro was convicted after trial, but the trial

court granted his subsequent motion to set aside the verdict, finding that his trial had been rife

with prosecutorial misconduct. The Appellate Division reversed on the basis that although there

had been prosecutorial misconduct, it had not denied him of a fair trial as a matter of law,

making reversal under C.P.L. § 330.30 improper. The case was remanded for sentencing and the

trial court with extreme reluctance, sentenced D'Alessandro as required under New York's Penal

Law, to a term of 15 years to life, the minimum term given that the top count of the indictment was for a class A-1 felony (kidnaping in the first degree). The trial judge took the decidedly unusual step of submitting an affidavit in support of D'Alessandro's motion to reduce his sentence, which was unsuccessful.

When D'Alessandro first appeared for parole in 2007, the district attorney's office who had prosecuted him submitted a letter in support of his early release. Assistant District Attorney ("A.D.A.") John Irwin, in his letter dated 6/26/2007 (Docket No. 7-2), stated as follows:

> I reviewed D'Alessandro's disciplinary record, which appears to be *exemplary*, and was informed by [defense counsel] that D'Alessandro long ago accepted responsibility for his crime. After speaking with Ms. Morris [the prosecutor at trial] and reviewing the underlying facts of D'Alessandro's crime, it is the Office's position that the 15 years he has already served adequately addresses the nature and consequences of the crime he committed and that justice does not require any additional incarceration. Ms. Morris concurs with this assessment.

(Docket No. 7-2) (emphasis added). A.D.A. Irwin, A.D.A. Morris (the former prosecutor), as well as the New York State Division of Parole, all have concluded, implicitly or explicitly, that D'Alessandro is presently a non-violent person. Respondents do not argue, and in fact conceded at oral argument, that D'Alessandro's disciplinary record while in immigration custody is unblemished.

Third, the record overwhelmingly supports a finding that "[t]he detainee is likely to remain nonviolent if released." 8 C.F.R. § 241.4(e)(3). As noted above, the crime of conviction was a classic "self-help" situation in which the victim was someone whom D'Alessandro believed to have been stealing from their employer; it is obvious that D'Alessandro is not a "career criminal" or a person prone to wanton violence. He has admitted his poor judgment and culpability and, by all accounts, is a success story for rehabilitative incarceration. This is not to

minimize the seriousness or the unlawfulness of his actions. However, the People of the State of New York originally believed that jail time was not even warranted for the crimes he was alleged to have committed.  Ultimately, the appellate courts disagreed and D'Alessandro did serve a term of imprisonment. However, representatives of the People of the State of New York (i.e., the District Attorney's Office and the prosecuting attorney), as well as New York's Parole Division, concluded that he was entitled to be released to parole supervision well before the maximum expiration date of his sentence.

Furthermore, D'Alessandro is a fifty-year-old man with a constellation of serious, debilitating, and progressive health problems. Respondents' medical witness, Dr. Brenda Bailey, testified at the hearing that she considers D'Alessandro "chronic care patient" who "absolutely" must continue to seek medical treatment.  According to Dr. Bailey and the medical records, D'Alessandro has an enlarged prostate gland which is causing urinary outlet obstruction (i.e., pain and difficulty emptying his bladder). Dr. Bailey has sent D'Alessandro for further testing to determine if the prostate hypertrophy is benign or cancerous. Follow-up regarding the prostate issue is required in either scenario. D'Alessandro suffers from renal (kidney) cysts which must be followed to make sure that they do not rupture or bleed. He has "significant" varicose veins, a consequence of which is that he risks suffering a deep vein thrombosis. Because of his venous impairments, the blood vessels are not returning blood to the heart well. This causes pooling of blood in his legs, visible as a dark rash (stasis dermatitis). The varicose veins also cause pain and swelling in his legs, for which Dr. Bailey has recommended compression hose. D'Alessandro also is experiencing near-vision problems (foggy vision), for which he has been referred to an eye doctor to determine whether they are related to his vascular issues or simply to age-related

changes. D'Alessandro has experienced a fairly dramatic and unintended weight loss of sixteen pounds (180 pounds in November 2007, to 164 pounds in January 2009) during his incarceration at the DHS facility.

When asked if it would be fair to say that D'Alessandro's health was "in decline," Dr. Bailey said that she did not know what kind of care he was getting before he entered DHS custody. He was initially screened by a Physician's Assistant and Registered Nurse in November 2007, upon his arrival, and none of the issues found by Dr. Bailey in her March 11, 2009 examination were present. Thus, the Court finds this response rather disingenuous, especially considering Dr. Bailey's demeanor at the hearing. The transcript of the hearing will show that Dr. Bailey was argumentative with respondents' counsel, as well as with the Court and petitioner's counsel, repeatedly interrupting or talking over petitioner's counsel and the Court. In this Court's opinion, Dr. Bailey frequently came across as defensive of her professional judgment and appeared to be a partisan witness. Thus, the Court views with circumspection Dr. Bailey's conclusion that D'Alessandro's health is "normal" for someone his age. Certainly, she gave no indication that any of D'Alessandro's medical conditions were going to improve over time.

Fourth, the record supports the conclusion that "[t]he detainee is not likely to pose a threat to the community following release." 8 C.F.R. § 241.4(e)(4). Again, the relevant factors show that D'Alessandro is likely to live peacefully in his community: his letters of recommendation and his exemplary institutional records, along with his serious health concerns, speak to this. Indeed, as petitioner's counsel pointed out at the March 20th hearing, there has never been an allegation that D'Alessandro's has posed a danger to the community. Petitioner's

counsel indicated that the neighborhood in Queens to which D'Alessandro would be returning is very supportive of having him. D'Alessandro's wife, Cathy, with whom petitioner's counsel speaks every day, fervently wishes for petitioner to come live with her and her son at their family home. *See* Declaration of Cathy D'Alessandro (Docket No. 12). Petitioner's counsel indicates that D'Alessandro speaks to his wife several times a day. Mrs. D'Alessandro has stood by her husband for twenty-eight years and, petitioner's counsel indicates, prays that she will be able to come home soon. Petitioner's counsel stated that he asked Mrs. D'Alessandro to consider making the trip to appear at the hearing, but she "broke down," explaining that it would be too painful. Mrs. D'Alessandro  indicates that she is willing to use their house in Queens as collateral for a bail/supervised release bond. (Docket No. 12). By all accounts, D'Alessandro has and will continue to have overwhelming family and community  support upon his return. This factor weighs overwhelmingly in favor of finding that he is likely to remain nonviolent if released; is not likely to pose a threat to the community following release; and does not likely to violate the conditions of release. There are no factors that support a contrary conclusion.

Fifth, the only reasonable conclusion to be drawn from petitioner's complete rehabilitation, his chronic health problems, and his strong family support is that D'Alessandro "is not likely to violate the conditions of release." 8 C.F.R. § 241.4(e)(5). In addition, as a practical matter, D'Alessandro has nothing to gain by violating the conditions of his release. He has two avenues of legal recourse open to him right now, which might allow him to stay in the United States. The New York Court of Appeals recently has accepted his application to review his criminal conviction for kidnaping and assault–the same conviction, and only basis, for the order of removal against him. Thus, there is the distinct possibility that the removal order may be

nullified should he be successful before the New York Court of Appeals. *See* Letter of Brian

Gardner, Esq. dated October 20, 2008 at p. 2 (Docket No. 7-4). In addition, the Second Circuit

has not issued a decision on his stay motion or on his motion to reopen the BIA proceedings

against him. If the Second Circuit orders the BIA to reopen the proceedings, he may be

successful at overturning the removal order on an alternative legal basis (the former § 212(c)

provision regarding relief from deportation). *See id.* (Docket No. 7-4). For him to jeopardize his

chances at staying in this country by violating release terms would seem to be remote. Whatever

can be said about his lack of judgment in 1989, surely the same cannot be said of him now. I

refer in particular to a glowing letter attesting to his complete rehabilitation and character written

by Maria Ferrantelli, an administration and finance director of a nursery, who volunteered at the

Arthur Kill Correctional Facility's Blessed Virgin Mary Chapel. *See* Letter of Maria Ferrantelli

(Docket No. 7-2). Ms. Ferrantelli wrote about working with D'Alessandro beginning in June

2003. She met with him every week at the Residents Encounter Christ Group; D'Alessandro was

the clerk in the Catholic Chapel. Ferrantelli noted that he was an "ardent worker" who "fully

participated in each group" and whose recommendation led to the Our Lade of Hope Prayer

Group beginning at the C.F. in September 2004. (Docket No. 7-2). D'Alessandro gave several

"well formed" talks to the group, and Ferrantelli considered his "readings on psychology and the

mind" as a "lesson to all of us." She states that during the five years of knowing D'Alessandro,

she found him to be "a man of great integrity, [who] he takes his work and his God to heart."

(Docket No. 7-2). She has "seen him help inmates who have had sad news from home, or were

just denied parole," and his "words were always comforting, clear and to the point." (Docket No.

7-2). D'Alessandro was "well respected by the volunteers and most importantly by his fellow

inmates." (Docket No. 7-2). She felt sure that if released, he would not be returned, since he had

spent "15 years in prison learning and growing not only spiritually but emotionally and

academically as well" and had not "waste his time with idle nonsense." (Docket No. 7-2). Most

remarkable to the Court is D'Alessandro's apparent complete lack of bitterness or self-pity in his

circumstances.

Sixth, the record indicates that "[t]he detainee does not pose a significant flight risk if

released." 8 C.F.R. § 241.4(e)(6). Petitioner's counsel pointed out at the hearing that after his

arrest in 1989, D'Alessandro was released on his own recognizance throughout his trial. He

made every court appearance. Even after he was found guilty, he was released on a $10,000 bail

bond–and continued to make all of his court appearances. After the First Department reinstated

his conviction, and remanded the matter for sentencing, D'Alessandro was not incarcerated.

Knowing that he faced a mandatory minimum of 15 years to life, he still appeared voluntarily for

sentencing. The Court has already reviewed D'Alessandro's spotless institutional records, his

letters of reference and attestations to his character, his family support, and his medical

issues–all of which support a finding that he is not a flight risk. Furthermore, D'Alessandro is

still subject to a lifetime of parole supervision by New York State. Thus, there would be an

additional layer of supervision if he were released from DHS custody.

Indeed, at oral argument on March 20th, respondents' attorney never claimed that it was

the Government's position that D'Alessandro himself was a flight risk. She alluded to the

Government's general interest in preventing aliens from disappearing during removal and

deportation proceedings, and seemed to be arguing that this general "policy" was sufficient to

deny release under the regulations. This is contrary to *Zadvydas* and to 8 C.F.R. § 241.4, which

require an individualized determination. The post-order custody review process "contemplated by the regulations is a meaningful individualized review, as the interest involved is the 'most elemental of liberty interests–the interest in being free from physical detention.'" *Bonitto*, 547 F. Supp.2d at 758 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

It is further apparent that DHS/ICE also failed to take into account the "following factors [which] should be weighed in considering whether to recommend further detention or release of a detainee." 8 C.F.R. § 241.4(f). First, "nature and number of disciplinary infractions or incident reports received when incarcerated or while in Service custody," 8 C.F.R. § 241.4(f)(1), is zero in D'Alessandro's case. The second factor in 8 C.F.R. § 241.4(f) is "[t]he detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history[.]" 8 C.F.R. § 241.4(f)(2). DHS did consider this one. However, this factor is of extremely limited help to respondents. It holds up only if one looks only at the initial indictment and ignores the fact that despite the seriousness of the charges, D'Alessandro was offered a plea with *no* jail time and his exemplary conduct while incarcerated. The rest of the considerations listed in 8 C.F.R. § 241.4(f)(2) actually weigh, overwhelmingly, in D'Alessandro's favor, as discussed above. Third, there are no negative "psychiatric and psychological reports pertaining to the detainee's mental health[.]" 8 C.F.R. § 241.4(f)(3). Fourth, as discussed above, there is only overwhelmingly favorable "[e]vidence of rehabilitation including institutional progress relating to participation in work, educational, and vocational programs[.]" 8 C.F.R. § 241.4(f)(4). Fifth, D'Alessandro has "[f]avorable factors, including ties to the United States such as the number of close relatives residing here lawfully,"

-51-

8 C.F.R. § 241.4(f)(5), as discussed above. Sixth, D'Alessandro has no "[p]rior immigration

violations and history[.]" 8 C.F.R. § 241.4(f)(6). Seventh, all of the evidence in the record points

to the conclusion that there is no "likelihood that the alien is a significant flight risk or may

abscond to avoid removal," 8 C.F.R. § 241.4(f)(7), since there is no "history of escapes, failures

to appear for immigration or other proceedings, absence without leave from any halfway house

or sponsorship program, [or] other defaults[.]" 8 C.F.R. § 241.4(f)(7). Finally, as discussed in

detail above, all of the "other information . . . is probative" that "the alien is likely to–(i) Adjust

to life in a community" and is not likely to "[e]ngage in future acts of violence, (iii) [e]ngage in

future criminal activity, (iv) [p]ose a danger to the safety of himself or herself or to other persons

or to property, or (v) [v]iolate the conditions of his or her release from immigration custody

pending removal from the United States." 8 C.F.R. § 241.4(f)(8).

Notably, respondents' attorney stated that she did not disagree with this Court's

statement that D'Alessandro is a "poster child for release." Rather, she maintained that the

"balancing [of the regulations factors] had been done." Unfortunately, as detailed above, there

was no "balancing" of the considerations for release set forth in 8 C.F.R. § 241.4(e)(1)-(6). There

cannot be said to have been a "balancing" of factors when it is apparent that only one

consideration–the detainee's criminal record–has been included in the calculus. *Accord*, *e.g.*,

*Oyedeji*, 332 F. Supp.2d at 754-57. At the hearing, respondents' attorney kept returning to this

refrain–that continued detention is appropriate because D'Alessandro will be released in the

reasonably foreseeable future, either by release following a successful appeal, or removal should

his appeals prove unsuccessful.

I further note that respondents' attorney has argued at the hearing that "DHS doesn't have

to go back" and do another custody review because "there is a foreseeable expectation that he

would be released." However, the Government's "[c]onclusory statements" that "removal is

expected in the reasonable [sic] foreseeable future' or an alien would 'pose a danger to society'

if released, with no factual basis or explanation" amount, in D'Alessandro's case, to "a

perfunctory and superficial pretense instead of a meaningful review sufficient to comport with

due process standards," *Bonitto*, 547 F. Supp.2d at 758.

     *Zadvydas* stands for the proposition that Due Process requires more than the cramped

reading of an agency mandate coupled with a distorted, and pre-determined presentation of a

person's record, to deny one his liberty. As I stated at the hearing, if the Government is not going

to present the factual bases for denying release from custody now,  when is it going to do so? It

hardly needs pointing out, but a person's liberty is at stake. The time for this type of

documentation clearly was many months ago, at the time of the custody reviews, as the DHS

Report and the regulations provide. Without question, the documentation at issue is now long

overdue–D'Alessandro has filed a habeas corpus petition, he has been in DHS/ICE custody for

fifteen (15) months. This Court has conducted an expedited hearing on the legality of his

detention. At the hearing, respondents pointed to nothing more to the so-called presumption of

"administrative regularity" to support their position that the Government is "not required to show

what they did."  Clearly, the DHS Report and the regulations indicate otherwise. Moreover,

given the myriad shortcomings in DHS/ICE's handling of D'Alessandro's case, any presumption

of "administrative regularity" has evaporated.

    **F.**    **Respondents' Continued Detention of D'Alessandro Is In Violation of**
          ***Zadvydas v. Davis*, 533 U.S. 678 (2001)**

    To reiterate, due process principles continue to apply to D'Alessandro even though he is

an alien under a final order of removal from the United States. D'Alessandro was lawfully

admitted on a B-2 visa, and accorded legal permanent resident status three years after his entry.

*See Zadvydas*, 533 U.S. at 693-94 ("Due Process Clause applies to all 'persons' within the

United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent. ") (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77

(1976); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596-598, and n. 5 (1953); *Yick Wo v.*

*Hopkins*, 118 U.S. 356, 369 (1886); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206,

212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled

only after proceedings conforming to traditional standards of fairness encompassed in due

process of law"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (Due Process Clause

protects an alien subject to a final order of deportation, though the nature of that protection may

vary depending upon status and circumstance); *Landon v. Plasencia*, 459 U.S. 21, 32-34 (1982);

*Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)).

Petitioner argues that respondents have misinterpreted *Zadvydas* and applied an incorrect

standard, since they state that "'it was and is D'Alessandro's burden to demonstrate that there is

no significant likelihood of removal in the reasonably foreseeable future.'" Pet'r Reply at 18

(Docket No. 8) (quoting Resp't Mem. at 14) (Docket No. 5). Respondents argue, and represented

at the hearing, that D'Alessandro has not met his burden and therefore release is not warranted.

*See id.* Thus, petitioner argues, respondents "rely on an argument that the detainee has not met

his burden as the complete argument for why incarceration persists." Pet'r Reply at 18 (Docket

No. 8). Respondents concede that if no significant likelihood of removal in the reasonably

foreseeable future is shown, then release must occur unless special circumstances exist, as set

forth in 8 C.F.R. § 241.14. Pet'r Reply at 18 n.12 (Docket No. 8).

The Supreme Court held in *Zadvydas* that "[a]fter the 6 month period, once the alien

proves good reason to believe that there is not significant likelihood of removal in the reasonably

foreseeable future, the Government must respond to rebut that showing" 533 U.S. at 701. I agree

with petitioner that the burden upon the detainee is not to "demonstrate" no reasonably

foreseeable, significant likelihood of removal or "show that his detention is indefinite," as

respondents asserted in their Memorandum of Law and at oral argument on March 20th. *See*

Resp't Mem. at 15 (Docket No. 5); Pet'r Reply at 18-19 (Docket No. 8). Rather, the Supreme

Court held in *Zadvydas* that the detainee need only provide "good reason to believe" that

removal is not significantly likely in the reasonably foreseeable future. Pet'r Reply at 19 (Docket

No. 8) (citing *Zadvydas*, 533 U.S. at 701). In the DHS Report submitted by petitioner, DHS state

that "'[t]o justify prolonged detention, current laws, regulations, policies and practices require

the federal government to either establish that removal can be secured in the reasonably

foreseeable future, or prove that a detainee meets certain stringent criteria outlined below [for

special circumstances in 8 C.F.R. 241.14].'" Pet'r Reply at 19 (Docket No. 8) (quoting DHS

Report at 3, Docket No. 7-9) (alteration by petitioner).

In reviewing respondents' papers and statements at oral argument, I have found no

meaningful attempt to address *Zadvydas*. Indeed, respondents implicitly argue that D'Alessandro

is not subject to *Zadvydas*'s protections because he has sought a stay (although no stay has been

entered) and has filed legal challenges to his underlying conviction and removal proceedings.

Respondents conceded at oral argument that they were not saying D'Alessandro's appeals were

frivolous, but rather that DHS is "concerned as a policy matter with frivolous challenges to

removal."  As I discussed above in this Report and Recommendation, respondents have cited no

persuasive authority for the proposition that an alien seeking to avail himself of legal remedies,

which he is entitled to pursue, has locked the keys to his own cell. As  he Sixth Circuit observed

in *Ly v. Hansen*, 351 F.3d at 272,

> [A]ppeals and petitions for relief are to be expected as a natural part of the
> process. An alien who would not normally be subject to indefinite detention
> cannot be so detained merely because he seeks to explore avenues of relief that
> the law makes available to him. Further, although an alien may be responsible for
> seeking relief, he is not responsible for the amount of time that such
> determinations may take. The mere fact that an alien has sought relief from
> deportation does not authorize the INS to drag its heels indefinitely in making a
> decision. The entire process, not merely the original deportation hearing, is
> subject to the constitutional requirement of reasonableness.

*Id.* (quoted in *Oyedeji*,  332 F. Supp.2d at 754). Furthermore, the Supreme Court in *Zadvydas*

recognized only two justifications offered by the Government for prolonged civil

detention–preventing flight, which is weak or nonexistent where removal seems a remote

possibility; and protecting the community, which has been upheld only when limited to specially

dangerous individuals and subject to strong procedural protections. As explained above, neither

of these justifications are supported by the record in this case. And, more important for this

aspect of the discussion, *Zadvydas* does not stand for the proposition that respondents

urge–namely, that a detainee's commencement of legal challenges justifies prolonged civil

detention.

 Respondents asserted at oral argument that there is no precedent for concluding that

where an alien is unable to be removed solely because of his own litigation that detention is

rendered "indefinite" as a matter of law. Respondents contended that "unknown" is not the same

as "indefinite." Regardless of whether that is true in general or in this case, D'Alessandro is not

required to prove under *Zadvydas* that his detention is "not indefinite." Thus, respondents are incorrect to they extent that they characterize *Zadvydas*'s holding otherwise. Although there eventually will be final resolutions of his matters pending before the New York Court of Appeals and the Second Circuit, the course of events in these cases are sufficiently unknowable, as to substance and duration, to convince this Court that D'Alessandro has established good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. As to the Second Circuit matter, oral argument has not even been held, and there is no indication as to when a decision will be issued after that court hears the case. If the Second Circuit decides in D'Alessandro's favor, he will no longer be under a final order of removal and immigration proceedings will be re-opened and will continue. Thus, even if D'Alessandro is successful before the Second Circuit, his release is not guaranteed, as the Government surely will seek to continue his detention during the removal proceedings. With regard to the matter before the New York Court of Appeals, there likewise is no indication as to when a final decision will be issued.

Respondents also have failed to address in their papers or at oral argument the aspect of the *Zadvydas* holding that "[f]or detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." 533 U.S. at 701. As DHS has formally stated in its report, "'the longer an alien remains in INS custody after being ordered removed, the higher the burden on the Government to establish that the alien's removal is going to occur in the reasonably foreseeable future.'" Pet'r Reply at 19 (Docket No. 8) (quoting DHS Report at 3, Pet'r Ex. H) (citing INS Detention and Removal Manual, ch. 7)).

Here, D'Alessandro's detention has lasted sixteen (16) months. The first six months are

considered "presumptively reasonable" under *Zadvydas*; the last ten (10) months are not. *See id.* The postremoval period confinement has thus been almost double the length of what is considered presumptively reasonable. In cases such as this, *Zadvydas* instructs that what counts as the reasonably foreseeable future accordingly diminishes; in effect, it becomes closer in time. Given the protracted detention thus far, I believe the reasonably foreseeable future has nearly shrunk to the point of being the present time.

Respondents have not recognized that they are required to rebut D'Alessandro's showing under *Zadvydas*. However, even if they were to do so, they can come forward with nothing other than an assertion that his detention will end at some unspecified and unpredictable time when one of his two legal challenges comes to a final resolution, and that they were able to secure travel documents for D'Alessandro in the past. I do not find either argument persuasive. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1081 (9th Cir. 2006) ("Nor are we persuaded by the government's argument that because the Attorney General will someday review Nadarajah's case, his detention will at some point end, and so he is not being held indefinitely. No one can satisfactorily assure us as to when that day will arrive. Meanwhile, petitioner remains in detention."). I also note that *Zadvydas* specifically declined to accept that continued detention is lawful as long as "'good faith efforts to effectuate . . . deportation continue" and that petitioner "'Zadvydas failed to show that deportation will prove "impossible."'" *Zadvydas*, 533 U.S. at 701 (quotation omitted). The Supreme Court held that this "standard would seem to require an alien seeking release to show the absence of any prospect of removal–no matter how unlikely or unforeseeable–which demands more than our reading of the statute can bear." *Id.* Respondents' reading of the statute here is in tantamount to one that the Supreme Court explicitly rejected in

*Zadvydas*.

For the foregoing reasons, I recommend granting relief on petitioner's claim that his continued civil detention violates the Due Process clause under *Zadvydas*.

## IV.   Conclusion

For all of the foregoing reasons, I recommend finding that DHS/ICS's review of D'Alessandro's custody has been grossly defective in constitutional terms, and that its decisions to continue detention have neither been in accordance either with Due Process requirements as interpreted by *Zadvydas v. Davis* nor in compliance with DHS/ICE's own regulations. Furthermore, I recommend finding that DHS/ICE's conclusion that D'Alessandro is a flight risk or a danger to the community is patently unreasonable in light of the evidence in the record. Indeed, it is contradicted by the record. Finally, I recommend concluding that D'Alessandro has demonstrated that his detention is illegal under *Zadvydas* in that he has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701, and that respondents have not rebutted that showing. Accordingly, I recommend that the petition be granted unconditionally, and D'Alessandro released immediately pursuant to reasonable conditions of supervision and bond, as determined by DHS, subject to review and oversight by the District Court.

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:        March 25, 2009
              Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1ˢᵗ Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:        March 25, 2009
              Buffalo, New York.