IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NEW YORK

GIUSEPPE D'ALESSANDRO,

Petitioner,

-vs-

**No. 08-CV-914(RJA)(VEB)**
**DECISION AND ORDER**

MICHAEL B. MUKASEY, United States
Attorney General; MICHAEL CHERTOFF,
Secretary of the Department of Homeland Security;
MARTIN HERRON, Assistant Field Office
Director for the Buffalo Federal Detention Facility
for United States Immigration and Customs
Enforcement; and all other persons exercising
direct legal control over the Petitioner,

Respondents.

## I.     Introduction

Represented by counsel, petitioner Giuseppe D'Alessandro (hereinafter, "D'Alessandro"

or "petitioner"), an alien under a final order of removal, sought a writ of habeas corpus pursuant

to 28 U.S.C. § 2241 challenging his continued detention in the custody of respondents

(hereinafter, "respondents", "DHS/ICE",[1] or "the Government"). The matter was referred me

pursuant to 28 U.S.C. § 636(b)(1).

Following an evidentiary hearing and oral argument, I recommended that D'Alessandro's

petition be granted and that a writ of habeas corpus issue directing his release from custody

---

[1]     On March 1, 2003, the former Immigration and Naturalization Service ("INS") ceased to exist as
an agency and was reorganized into the U.S. Immigration Customs and Enforcement, and the U.S. Citizenship and
Immigration Services under the Department of Homeland Security. See, Title 6 U.S.C. § 252, stat. notes (2003).
Immigration and Customs Enforcement ("ICE") is a subagency of the United States Department of Homeland
Security ("DHS").

subject to appropriate conditions of supervision by DHS/ICE. I stated in conclusion as follows:

> I recommend finding that DHS/ICE's review of D'Alessandro's custody has been grossly defective in constitutional terms, and that its decisions to continue detention have neither been in accordance either with Due Process requirements as interpreted by *Zadvydas v. Davis* nor in compliance with DHS/ICE's own regulations. Furthermore, I recommend finding that DHS/ICE's conclusion that D'Alessandro is a flight risk or a danger to the community is patently unreasonable in light of the evidence in the record. Indeed, it is contradicted by the record. Finally, I recommend concluding that D'Alessandro has demonstrated that his detention is illegal under *Zadvydas* in that he has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701, 121 S.Ct. 2491, and that respondents have not rebutted that showing. Accordingly, I recommend that the petition be granted unconditionally, and D'Alessandro released immediately pursuant to reasonable conditions of supervision and bond, as determined by DHS, subject to review and oversight by the District Court.

I contemporaneously issued a Decision and Order admitting D'Alessandro to bail. The Government sought an emergency stay of the proceedings, and oral argument was held before former Chief Judge Arcara on April 1, 2009. Judge Arcara upheld the Bail Order, and D'Alessandro was released under supervision of DHS/ICE.  On June 1, 2009, former Chief Judge Arcara entered a Decision and Order adopting the proposed findings in the Report and Recommendation and noting that petitioner had been released as of approximately eight weeks as of the date of the Order, maintaining contact with his state parole officers and living at home with his family without incident. Former Chief Judge Arcara commented that petitioner's conduct since his release "further justifie[d] the findings that Magistrate Judge Bianchini made in his Report and Recommendation."

Pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, petitioner, through his attorneys, now has filed a motion (Docket No. 39) seeking reimbursement for fees and costs incurred in connection with the present habeas corpus action in which he successfully

challenged the legality of his detention by respondents. The Government has opposed the motion.

To facilitate discussion of some of the issues presented by petitioner's EAJA application, I will briefly summarize the law relating to petitioner's detention and its intersection with the facts of the present case. Generally speaking, DHS/ICE may detain a deportable alien while removal proceedings are pending. *Demore v. Kim*, 538 U.S. 510, 531 (2003). After a removal order becomes final, DHS/ICE must detain the alien until he is removed, for up to ninety days (the "removal period"). 8 U.S.C. § 1231(a)(2); see also *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). In *Zadvydas v. Davis*, the Supreme Court rejected as unconstitutional the Government's argument that the Attorney General has discretion to detain indefinitely an alien subject to a final Removal Order. 533 U.S. at 689, 692 ("The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection is obvious"). In *Zadvydas v. Davis*, to save the statute from unconstitutionality, the Supreme Court read into it a "reasonableness" requirement. The Supreme Court instead read a temporal limitation into INA § 241(a)(6), Title 8 U.S.C. § 1231(a)(6), holding that, although detention beyond the 90-day removal period was permitted by statute, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas v. Davis*, 533 U.S. at 699 (citation omitted). Thus, an immigrant's continued detention violates the Constitution "if removal is not reasonably foreseeable." *Zadvydas*, 533 U.S. at 699-700. In such circumstances, the district court "should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700.

The *Zadvydas* court contemplated that the determination of whether removal was

"reasonably foreseeable" would be made in consideration of an immigrant's Petition for Habeas

relief under Title 28 U.S.C. § 2241. *See Zadvydas v. Davis*, 533 U.S. at 699 (citing Title 28

U.S.C. § 2241(c)(3) for the Courts' authority to determine whether detention is "in violation of

the Constitution or laws or treaties of the United States").[2] For consistency's sake, the Supreme

Court decreed that it was "presumptively reasonable" for the INS to detain an alien for six (6)

months following a final Removal Order-i.e., for the initial 90-day removal period, plus another

90 days. *Id.* at 701 "After this 6-month period, once the alien provides good reason to believe

that there is no significant likelihood of removal in the reasonably foreseeable future, the

Government must respond with evidence sufficient to rebut that showing." *Id.* Thus, the Court

found that the statute permits DHS/ICE to detain an alien beyond the removal period only as long

as reasonably necessary to bring about his removal and that "once removal is no longer

reasonably foreseeable, continued detention is no longer authorized." *Id.* at 689, 699. The Court

further stated that detention beyond six months after the issuance of a final removal order is

presumed unconstitutional but that the government can rebut the presumption by establishing that

removal is reasonably foreseeable. *Id.* at 701.

## II.    FACTS AND PROCEDURAL BACKGROUND

On July 25, 1978, petitioner entered the U.S. under a B-2 visa. On June 22, 1981, his

immigration status adjusted at Philadelphia, PA, to a Legal Permanent Resident under INA §245.

Petitioner is married with one son; his wife and son are U.S. citizens and live in Queens, New

---

[2]       A Habeas Petition under Section 2241, however, may not be used to seek review of an Order of Removal in a Federal District Court: "Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]" INA § 242(a)(5), Title 8 U.S.C. § 1252(a)(5) (emphasis added).

York. On August 14, 1989, D'Alessandro was arrested on charges of Kidnaping 1st (with intent to collect ransom; class A-1); Attempted Robbery 1st (class C); Coercion 1st (class D); Non-Auto Grand Larceny 2nd (class D); and Assault 2nd (intent to cause bodily injury). This was his first and only contact with the criminal justice system.[3] D'Alessandro remained free on bond during the pendency of his criminal proceedings.

Apparently with the advice and consent of his trial counsel, D'Alessandro rejected a plea offer involving probation *only* and no jail time, and elected to proceed to trial. On June 25, 1991, a guilty verdict was entered in New York State Supreme Court, County of New York, following a jury trial. Upon D'Alessandro's motion to set aside the verdict under New York Criminal Procedure Law ("C.P.L.") § 330.30, the trial court granted a new trial, holding that the cumulative effect of the prosecutor's misconduct was overwhelmingly prejudicial. The District Attorney appealed. On December 22, 1993, the Appellate Division, First Department, reversed the trial court and reinstated the jury's verdict. *People v. D'Alessandro*, 184 A.D.2d 114 (App. Div. 1st Dept. 1992). The First Department held that the prosecutor "on occasion did exceed the bounds of legitimate fair comment as when, for example, she suggested that a witness might be exposing himself to danger by testifying, appealed to the jurors' generalized fear of crime, and their sympathies, and vouched for the credibility of the People's witnesses." *Id.* (citations omitted). However, the appellate court held that the summation "was within the range of acceptability, and it cannot be reasonably found that she tried to depict defendant as a mobster

---

[3]    The underlying conviction arose out of a dispute between petitioner and an employee who worked at the restaurant owned by petitioner's father-in-law and where petitioner worked as a manager. The employee was suspected of stealing $3,000 from the restaurant. According to the employee, after they argued about the money, petitioner confined him in the restaurant's basement for over 12 hours, threatening him with a gun and seeking return of the money. Petitioner maintained that he did not confine the employee. He rejected a plea offer which involved a sentence of probation only. (Docket No. 1).

who merited punishment for his general character and intimidation of witnesses rather than for the specific crimes with which he was charge." *Id.* Because the First Department found the proof of guilt "overwhelming," any misconduct was "harmless error" and petitioner's right to a fair trial "was not abridged as a matter of law." *Id.* Accordingly, "the trial court was not warranted in granting the motion to vacate the conviction under C.P.L. § 330.30." *Id.*

Throughout this time, D'Alessandro was released on bond. On April 20, 1993, petitioner appeared voluntarily for sentencing, knowing that he was to be sentenced to a minimum of fifteen (15) years in prison. After stating his dismay at having to sentence D'Alessandro to jail time, the trial court imposed concurrent terms of imprisonment, the longest of which was 15 years to life on the Kidnaping 1st conviction. This was the mandatory minimum sentence under the Penal Law.

On May 10, 1993, petitioner entered NYSDOCS and serves his term at Arthurkill Correctional Facility on Staten Island. During his incarceration, he maintained an "exemplary" record, as attested to by the District Attorney, John Irwin, who on dated June 26, 2007, wrote a letter of support together with the prosecuting deputy, regarding D'Alessandro's first, successful parole application. (Docket No. 7-2).

On August 22, 1996, the First Department affirmed D'Alessandro's conviction on direct appeal, finding that the evidence was "overwhelming," rendering the any prosecutorial misconduct harmless error; the jury's determination as to fact and credibility were supported by the record; the claim regarding the propriety of the kidnaping jury instructions was un preserved; and the "available record indicates that defendant received the effective assistance of counsel, trial counsel having made appropriate pre-trial, trial and post-trial motions and applications,

-6-

vigorously cross-examined the People's witness and presented witnesses in support of the defense position that there had been no abduction or restraint of the complainant, and interposed numerous objections to summation comments by the prosecutor. Trial counsel's failure to object to the jury charge on kidnaping in the first degree, which in any event does not constitute reversible error in the circumstances, does not render trial counsel's representation less than meaningful." *People v. D'Alessandro*, 230 A.D.2d 656, 656-57 (App. Div. 1st Dept. 1996).

On February 19, 1998, DHS issued a notice to appear based upon his New York state convictions, which are considered "aggravated felony" convictions rendering petitioner removable under INA § 237(a)(2)(A)(iii).

On or about October 26,1998, or November 17, 1998, an Immigration Judge ("IJ") in Fishkill, New York, ordered petitioner deported, finding that he was ineligible to have his inadmissibility waived under former section 212(c) of INA, 8 U.S.C. § 1182(c), because he was in removal proceedings.

On March 30, 1999, the Bureau of Immigration Appeals ("BIA") affirmed the IJ's decision ordering deportation.

On October 15, 2007, ICE informed DHS that they had valid travel document for petitioner, and when New York State Department of Correctional Services ("NYSDOCS") set a release date, they would take him into DHS custody and arrange for his departure from the U.S.

On November 19, 2007, after serving 14 ½ years of 15-to-life sentence, petitioner was released on parole after his first parole appearance. He was immediately placed in custody of U.S. immigration.

On November 27, 2007, the BIA denied D'Alessandro's motion to reopen immigration

proceedings based upon petitioner's claim that he was eligible for relief under former § 212(c) of

the INA in light of the Supreme Court's decision in *St. Cyr v. INS*, 533 U.S. 289 (2001).[4]

On November 27, 2007, D'Alessandro filed petition for review of BIA's denial of motion

to reopen in the United States Court of Appeals for the Second Circuit. He also moved for a

formal stay order from Circuit.

On February 19, 2008, DHS denied D'Alessandro release after the 90-day custody review

on the basis that his removal was "reasonably foreseeable." Charles Mule, Acting Field Office

Director, issued the Decision to Continue Detention, stating that D'Alessandro had "failed to

demonstrate that there is no significant like hood [sic] of your repatriation in the foreseeable

future, pending the 2nd Circuit issues [sic] a decision on your case." (Docket No. 4-3). This

---

[4]    The BIA found that the final administrative order having been filed on 3/30/1999, the motion to reopen was untimely, and it declined to exercise its *sua sponte* power to reopen. The BIA stated that even if it were to treat the motion as specially relating to a § 212(c) waiver in light of the recently enacted regulations, it would still be untimely under 8 C.F.R. § 1003.44 (2007); the deadline for special motions was 4/26/2005, and petitioner filed his motion on 10/23/2007. Furthermore, the BIA found that petitioner had not shown that he was eligible for a waiver under former § 212(c) at the time he appeared before the IJ in 1998, because petitioner served in excess of 5 years in state prison for his aggravated felony conviction. Finally, BIA found that it did not matter whether petitioner was in removal or deportation proceedings at the time his § 212(c) waiver was requested; that made no difference to the outcome.  Note that INA former § 212(c) provided discretionary relief from deportation for aliens convicted of aggravated felonies who served terms of imprisonment less than five years. The new immigration statute, IIRIRA, and AEDPA, repealed this section. However, the Supreme Court held in *St. Cyr* that "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of the plea under the law then in effect"). This decision reflected approval of the Second Circuit's decision below in *St. Cyr v. INS*, 229 F.3d 406 (2d Cir. 2000), that "the bar on applying relief enacted in AEDPA § 440(d) and IIRIRA § 304 does not apply to an alien who pled guilty or *nolo contendere* to an otherwise qualifying crime prior to IIRIRA's enactment date."  In *Ponnapula v. Ashcroft*, 373 F.3d 480 (2d Cir. 2004), the Third Circuit applied the rationale of *St. Cyr* to provide § 212(c) relief to an alien who relied upon the attenuated availability of § 212(c) to *decline* a plea agreement, finding that IIRIRA's elimination of § 212(c) was impermissibly retroactive when applied to aliens electing to go to trial on the reasonable reliance of the availability of § 212(c) relief. D'Alessandro's counsel is relying upon *Ponnapula* as support in connection with the petition to reopen pending in the Second Circuit. Counsel he notes in the Motion to Stay that one of the state-court post-conviction motions filed in D'Alessandro's case involved trial counsel's "failure . . . to properly engage in, and advise on, plea negotiations when the defendant had been offered a lesser felony with a probationary sentence." (Docket No. 4-3). In  his motion for attorney's fees (Attorney Affirmation at 4 n.4 Docket No. 39-2), petitioner's attorney informs the Court that the Second Circuit has yet to rule on petitioner's motion to reopen the BIA's denial of the motion to reopen on the former § 212(c) issue. If the Circuit rules in petitioner's favor, the administrative removal proceedings will be reopened and continue. *Id.* (Docket No. 39-2).

decision was "made based on a review of your file and consideration of information you submitted to ICE's reviewing officials." *Id.* The letter-decision made no specific mention of any of the release conditions forth in 8 C.F.R. § 241.4, such as D'Alessandro's criminal history, flight risk, danger to the community.

On October 20, 2008, petitioner's attorney requested a custody review by DHS. (Docket No. 4-3). In an undated letter, received by petitioner's counsel on November 10, 2008, Martin Herron of DHS denied the request for release "[u]pon the totality of information involved in this case" and stated "[t]here is no appeal to this decision." (Docket No. 4-3).

On November 26, 2008, the New York Court of Appeals, in an unusual move, agreed to review D'Alessandro's conviction by mandamus. The Court of Appeals certified that "questions of law requiring review pursuant to C.P.L. § 460.20 were involved in the order of the First Department's Appellate Division dated 8/19/2008, denying defendant's motion for reargument of the denial of his writ of error *coram nobis* entered 5/11/2000 (*People v. D'Alessandro*, 272 A.D.2d 1002 (App. Div. 1st Dept. 2000)." *See People v. D'Alessandro*, 11 N.Y.3d 854 (N.Y. Nov. 26, 2008).[5]

On December 15, 2008, through counsel, D'Alessandro filed the instant 28 U.S.C. § 2241 petition for habeas corpus relief in this Court.

On January 28, 2009, the Second Circuit granted petitioner's motion for extension of time until February 18, 2009, to file his reply brief on the petition for reopening; however, no decision was rendered on the stay request. There is no official indication on the Second Circuit's docket at

---

[5]     Petitioner's counsel has informed the Court that in September 2009, the New York Court of Appeals remanded D'Alessandro's appeal for reconsideration of the issues raised therein.

this time as to when oral argument will be held or a final decision rendered. Respondents'
attorney indicated at the hearing held before me on March 20, 2009, that oral argument has been
proposed for sometime in April 2009, before the Second Circuit.

On February 10, 2009, petitioner's counsel submitted a letter providing an update of
D'Alessandro's circumstances and requesting another custody review from DHS. On February
11, 2009, Martin Herron ("Herron"), Field Office Director with DHS, issued a letter decision to
continue D'Alessandro's custody based upon a "review of your file and/or your personal
interview and consideration of any information you submitted to ICE's reviewing officials."
(Docket No. 4-3). After reviewing the underlying conviction and immigration proceedings,
Herron stated,

> "Your criminal history includes convictions for kidnapping [sic] with intent to
> collect ransom, attempted robbery-1st, Assault with intent to cause bodily injury,
> attempted grand larceny-2nd and coercion. These convictions are considered
> severe in nature making you a threat to the community and a flight risk. Because
> of this history of disregard for the laws and order of the United States and its
> officials, you will not be released at this time. Please be advised that medical staff
> is available 24/7 to address any health issues that you may have during your
> detention. Once you have exhausted your appeals, Immigration and Customs
> Enforcement will continue to pursue the issuance of a travel document to facilitate
> your removal from the United States to Italy. [ICE] will conduct another review of
> your case in accordance with current regulations. It is in your best interest to
> maintain proper behavior while awaiting this review."

(Docket No. 4-3). That is the entirety of the custody decision.

On March 10, 2009, petitioner's counsel moved for expedited hearing and oral argument
based upon allegations of petitioner's deteriorating health.

On March 20, 2009, an expedited hearing and oral argument were held before the
undersigned. As the time of the hearing, D'Alessandro had been in DHS/ICE custody since

November 27, 2007, meaning that his detention had lasted sixteen (16) months, ten (10) months longer than the presumptively reasonable six-month period identified by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001).

At the hearing, respondents called one witness, Dr. Brenda Bradley, the Clinical Medical Director of the Federal Detention Facility in Batavia, New York ("the Batavia FDF"), since March 1998. Dr. Bradley testified that the FDF's medical unit is "fully operational, 24/7" and has a staff of two physician assistants, two nurse practitioners, and a pharmacy. The only physician is Dr. Bradley. She is responsible for 666 beds at the FDF (two-thirds are reserved for DHS, and one-third for the United States Marshal's Service), which has an daily average population of 580 inmates. Dr. Bradley testified that she is also is responsible for "other" medical facilities operated by DHS. She testified that the average length of stay at the Batavia FDF is "about 49 days" and confirmed that the average length of stay is less than six months. Dr. Bradley indicated that she first examined D'Alessandro, and reviewed his medical records, on March 11, 2009. To avoid repetition, and for ease of reference, I recount the sum and substance of Dr. Bradley's testimony regarding D'Alessandro's medical problems below, in the portion of the Report and Recommendation to which it is directly relevant.[6]

I "strongly recommend[ed] finding that DHS's review of D'Alessandro's custody has been grossly defective in constitutional terms, and that its decisions to continue detention have neither been in accordance either with Due Process requirements as interpreted by *Zadvydas v. Davis* nor in compliance with DHS's own regulations." Furthermore, I "recommend[ed] finding

---

[6]       Due to the urgency of this matter, I issued a Report and Recommendation without waiting for an official transcript to be prepared, relying upon my extensive notes and those taken by my staff at the hearing. To the extent that they vary from the transcript, this Court defers to the transcript.

that DHS's conclusion that D'Alessandro is a flight risk or a danger to the community [was] patently unreasonable in light of the evidence in the record," and in fact was "contradicted by the record." Finally, I "recommend[ed] concluding that D'Alessandro ha[d] demonstrated that his detention [was] illegal under *Zadvydas* in that he ha[d] shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701, and that respondents ha[d] not rebutted that showing," as the Government is required by Zadvydas to do. Accordingly, I recommended that the petition be granted unconditionally, and D'Alessandro released immediately pursuant to reasonable conditions of supervision and bond, as determined by DHS, subject to review and oversight by the District Court. I concomitantly issued a Decision and Order admitting petitioner to bail, subject to terms and conditions specified by DHS/ICE. Respondents sought an emergency stay and denial of the bail order. Following oral argument, Chief Judge Arcara, however, denied the stay and upheld the bail order.

On June 1, 2009, Chief Judge Richard Arcara adopted the Report and Recommendation granting petitioner habeas relief. The judgement became final on July 31, 2009.

In February 2009, prior to issuance of the Report and Recommendation, petitioner'– at respondents' suggestion–made a second request for a custody review from DHS/ICE. Petitioner's counsel's request was denied on March 31, 2009, six days after the this Court issued its Report and Recommendation on March 25, 2009. The perfunctory letter from DHS/ICE gave the following statement as its sole basis for denying D'Alessandro release:

> DHS believes, given [petitioner's] particularly egregious criminal record [i.e., the underlying 1991 conviction, which formed the basis for the order of removal] that your client [petitioner] poses a significant danger to the community.

See Petitioner's Exhibit C to Motion for Attorney's Fees (Docket No. 39-6).

## III.    DISCUSSION

### A.    Overview of the EAJA

Under the "American Rule," parties generally bear their own litigation costs unless Congress specifically provides otherwise. *Alyeska Pipeline Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Prior to the EAJA's passage in 1980, the federal government retained its common law immunity from suit, even if a statute specifically authorized the recovery of costs– unless the statute explicitly allowed recovery from the United States. *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 881 (7th Cir.1994) (citing *Alyeska*, 421 U.S. at 265-67, 95 S.Ct. 1612).

The EAJA "significantly overhauled § 2412 to allow for recovery against the federal government," *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d at 881. In particular, Section 2412(b) waives the government's immunity from suit and makes it liable for fees and costs to the same extent as any other party would be under the common law. *O & G Spring & Wire Forms*, 38 F.3d at 881 (citing 28 U.S.C. § 2412(b)). Further, Section 2412(d) "carved out an exception to the common law for most litigants, as defined in § 2412(d)(2)(B), holding the government to a higher standard[.]" *Id.* Section 2412(d) provides that

> Except as otherwise specifically provided by statute, a court shall award to a *prevailing party* other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States . . . *unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.*

28 U.S.C. § 2412(d)(1)(A). "Thus, eligibility for a fee award in any civil action requires: (1) that

the claimant be a "prevailing party"; (2) that the Government's position was not "substantially justified"; (3) that no "special circumstances make an award unjust"; and, (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement." *Commissioner, INS v. Jean*, 496 U.S. 154, 158 (1990). The EAJA further states that the "position of the United States" "means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D). Thus, in this particular case, DHS/ICE's actions in regard to D'Alessandro's custody reviews are considered as "part of the position of the United States."

The EAJA mandates that courts shift fees from individual plaintiffs to the government where the government's conduct has not been substantially justified, in order to "deter the unreasonable exercise of Government authority." *Ardestani v. INS*, 502 U.S. 129, 138 (1991) (citing Congressional Findings and Purposes, 94 Stat. 2325, note following 5 U.S.C. § 504; H.R. Rep. No. 96-1418, pp. 10, 12 (1980); S. Rep. No. 96-253, p. 5 (1979); *Commissioner, INS v. Jean*, 496 U.S. at 163. As the Second Circuit and other Circuits have explained, "Congress enacted the EAJA in 1980 to encourage private parties with limited funds to challenge unreasonable government actions by relieving successful litigants of litigation expenses when the government's position was not substantially based in law and fact." *Rosado v. Bowen*, 823 F.2d 40, 42 (2d Cir. 1987) (citations omitted). The D.C. Circuit has aptly described the EAJA as meant to discourage the federal government from using its superior resources unreasonably–"it is in this respect an 'anti-bully' law." *Battles Farm Co. v. Pierce*, 806 F.2d 1098, 1101 (D.C. Cir.1986), *vacated*, 487 U.S. 1229 (1988).

Should a court determine that the government's position was not only without substantial justification but that it was also made in bad faith, a court, in calculating a reasonable fee, may disregard the statutory ceiling (discussed below) of section 2412(d)(2)(A). 28 U.S.C. § 2412(b); Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988)." *Kania v. Shalala*, No. 91-CV-0766E(H), 1995 WL 307604, *1 (W.D.N.Y. May 10, 1995) (Elfvin, D.J.).

The Supreme Court has explained that a district court's determination as to whether the government's position was "substantially justified" is "a multifarious . . . question, little susceptible ... of useful generalization" as either a question of law or fact. Pierce, 487 U.S. at 562; *accord, e.g.*, *Sotelo-Aquije*, 62 F.3d at 57. "In recognition of the complexity of the issue," the Second Circuit has stated that it "will reverse the district court's determination only for an abuse of discretion." *Sotelo-Aquije*, 62 F.3d at 57 (citing *Pierce*, 487 U.S. at 562; *Cassuto v. Commissioner of Internal Revenue*, 936 F.2d 736, 740 (2d Cir.1991) ("Generally, we review a trial court's decision whether to award attorneys' fees to a prevailing party, and in what amount, under an abuse of discretion standard. This standard also governs our review of the court's determination of whether the government's position in the litigation was substantially justified.") (internal and other citations omitted).

B.     **"Civil Action"**

Respondents conceded that the present action is a "civil action." *E.g.*, *Kholyavskiy v. Schlecht*, 479 F. Supp.2d 897, 901 (E. D. Wis. 2007) ("The phrase civil action is unambiguous, and an action for habeas corpus is without question a civil action [for purposes of the EAJA].") (citing *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting) (stating that habeas corpus is neither an appellate proceeding nor a criminal proceeding, "but rather an

original civil action"); *Cross v. Burke*, 146 U.S. 82, 88 (1892) (stating that "[i]t is well settled that a proceeding in habeas corpus is a civil and not a criminal proceeding"); *Vacchio v. Ashcroft*, 404 F.3d 663, 672 (2d Cir. 2005) (applying the EAJA to a habeas action challenging detention by ICE because the action was "both a civil action in its own right . . . and has its roots in a civil action"); *In re Petition of Hill*, 775 F.2d 1037, 1040-41 (9th Cir. 1985) (applying the EAJA to a habeas action challenging immigration-related detention).

## C. "Prevailing Party"

Respondent also concedes that petitioner is a "prevailing party." A prevailing party is one that has "succeeded on any significant issue in litigation which achieved some of the benefit the part[y] sought in bringing suit," such that the party is able to "point to a resolution of the dispute which changes the legal relationship between itself and the [adversary]." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-92 (1989) (citations and internal quotation marks omitted) (interpreting the "prevailing party" requirement under 42 U.S.C. § 1988); *accord*, *e.g.*, *Kerin v. United States Postal Serv.*, 218 F.3d 185, 189 n.1 (2d Cir. 2000).

## D. "Substantially Justified"

A position held by the government is substantially justified for purposes of the EAJA if it is "'justified in substance or in the main'–that is, . . . to a degree that could satisfy a reasonable person," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting Webster's New International Dictionary at 2514 (2d ed.1945)), or having a "reasonable basis both in law and fact[,]" *id.* *Accord, e.g.*, *INS v. Jean*, 496 U.S. 154, 158 n. 6 (1990) (endorsing the "reasonable basis both in law and fact" formulation used by several circuit courts in EAJA cases); *Sotelo-Aquije v. Slattery*, 62 F.3d 54, 57 (2d Cir. 1995) (internal quotation marks omitted); *Vacchio v. Ashcroft*,

404 F.3d 663, 672 (2d Cir. 2005); *Environmental Def. Fund, Inc. v. Watt*, 722 F.2d 1081, 1085

(2d Cir. 1983) (internal quotation marks omitted). *Healey v. Leavitt*, 485 F.3d 63, 67 (2d Cir.

2007); 28 U.S.C. § 2412(d)(1)(A). "To be 'substantially justified' means, of course, more than

merely undeserving of sanctions for frivolousness; that is assuredly not the standard for

Government litigation of which a reasonable person would approve." *Pierce*, 487 U.S. at 566;

*accord Kerin v. United States Postal Serv.*, 218 F.3d at 189. "To prove that its position was

'substantially justified,' the *government* bears the burden of showing that its position had 'a

*reasonable basis in both law and fact*.'" *Sotelo-Aquije*, 62 F.3d at 57 (emphases supplied)

(quoting *Federal Election Comm'n v. Political Contributions Data, Inc.*, 995 F.2d 383, 386 (2d

Cir.1993) (citing *Pierce v. Underwood*, 487 U.S. at 556), *cert. denied*, 510 U.S. 1116 (1994)).

"The test is essentially one of reasonableness." *Federal Election Comm'n v. Political

Contributions Data, Inc.*, 995 F.2d at 386.

    With respect to administrative actions, the "position of the United States" encompasses

the government's litigating position as well as the position taken by the administrative agency on

the merits. 28 U.S.C. § 2412(d)(2)(D) (The Government's position includes both "the position

taken by the United States in the civil action[ ][and] the action or failure to act by the agency

upon which the civil action is based,").

    Thus, in determining whether the government's position is substantially justified, I

consider both the agency decision which gives rise to the lawsuit and the government's posture

during the litigation. *Cummings v. Sullivan*, 950 F.2d 492, 497 (7th Cir. 1991); *see also INS v.

Jean*, 496 U.S. at 159; *Sotelo-Aquije v. Slattery*, 62 F.3d at 57; *Li v. Keisler*, 505 F.3d 913, 918

(9th Cir. 2007) ("For purposes of EAJA, "the position of the United States" includes the decisions

of the IJ [immigration judge] and the BIA, as well as the litigation position of the Department of Homeland Security.") (citing 28 U.S.C. § 2412(d)(2)(D)); *Singh v. Gonzales*, 502 F.3d 1128, 1129, No. 04-70300, 2007 WL 2562964, at *1 (9th Cir. Sept.7, 2007); *Thangaraja v. Gonzales*, 428 F.3d 870, 873-74 (9th Cir. 2005)). "Thus, the government must show that all of these positions were substantially justified in order to avoid an award of EAJA fees." *Li*, 505 F.3d at 918 (citing *Thangaraja*, 428 F.3d at 873-74); *Kiareldeen v. Ashcroft*, 273 F.3d 542, 545 (2d Cir. 2001) ("The government must meet this threshold twice. First, it must independently establish that the agency action giving rise to the litigation was substantially justified. Second, it must establish that its litigation positions were substantially justified.") (citing *Jean*, 496 U.S. at 159-60; *Natural Resources Defense Council, Inc. v. EPA*, 703 F.2d 700, 708 (3d Cir. 1983))

Respondents vigorously argue that the Government's and DHS/ICE's positions on the merits were substantially justified for the following reasons, as set forth in their Memorandum of Law:

> (1) whether an immigrant can be subjected to continued or prolonged detention under 8 U.S.C. § 1231 when a travel document has been made available but the Second Circuit's forbearance policy prevents removal, is an unsettled issue in this circuit that has usually resulted in a determination of the reasonableness of the length of the detention on a case-by-case basis;
>
> (2) section 1231, as interpreted by the Supreme Court in *Zadvydas*, permitted petitioner's continued detention;
>
> (3) case law from within this district supported continued detention under the circumstances presented here; and
>
> (4) Second Circuit precedent, decided pre-*Zadvydas* but not overruled, supported continued detention.

Resp't Mem. at 10. I address each of these arguments below.

1.      **Respondents' First Argument: Lack of settled law regarding detention of aliens under final order of removal while travel document available but Second Circuit's "forbearance policy" prevents removal**

Respondent agues that "[n]otwithstanding this Court's conclusions on the merits of [D'Alessandro's] case numerous court decisions have upheld detentions of similar and longer duration than that presented here, particularly where the only obstacle to the alien's removal was a stay of removal or the Second Circuit's forbearance policy." Resp't Mem. at 11 (citing *Lawrence v. Gonzales*, 446 F.3d 221, 227 (1st Cir. 2006); *Evangelista v. Ashcroft*, 204 F. Supp.2d 405, 409 (E.D.N.Y. 2002); *Archibald v. INS* , 2002 WL 1434391 (E.D. Pa. July 1, 2002); *Marcelus v. IN S*, 2002 WL 80301, at *1 (E.D. Pa. Jan. 16, 2002); *Copes v. McElroy*, 2001 WL 830673, at *6 (S.D.N.Y. July 23, 2001); *Lawrence v. Reno*, 2001 WL 812242 (S.D.N.Y. July 18, 2001); *Guner v. Reno*, 2001 WL 940576 (S.D.N.Y. Aug. 20, 2001)).

Perhaps unsurprisingly, respondents continue to rely on cases which this Court has already found to be unpersuasive and not on point with the present matter. In fact, the Court specifically discussed and rejected *Lawrence*, *Evangelista*, *Archibald*, *Marcelus*, and *Copes* in its Report and Recommendation. This Court stated in its Report and Recommendation, adopted by former Chief Judge Arcara,

> With regard to the Third Circuit case cited by respondents, *Lawrence*, there also
> were court-ordered stays in place. As petitioner points out, *Lawrence* "opined on a
> situation where a stay squarely within § 1231(a)(1)(B)(ii) existed." Pet'r Reply at 7
> (Docket No. 8). Here, the parties agree that there is no formal, court-ordered stay
> in place, and respondents do not claim that detention is under INA § 236, 8 U.S.C.
> § 1226. For instance, respondents state that "[i]f there were an actual
> court-ordered stay of removal, D'Alessandro's detention would be pursuant to
> INA § 236, 8 U.S.C. § 1226, and the start of the removal period would be deferred
> pursuant to INA § 241(a)(1)(B)(2), 8 U.S.C. § 1231(a)(1)(B)(2))." Resp't Mem. at
> 11 n. 3 (Docket No. 5).

> Furthermore, the cases cited by respondents at pages 12-13 of their Memorandum of Law did not engage in any analysis of the issue. Regardless of any deficiency in the analysis, the outcome of these cases effectively was that the petitioner was penalized for pursuing avenues of relief to which he or she was legally entitled, and thus continued detention was the petitioner's own fault. I do not find these cases factually apposite; nor are they binding precedent this Court. Rather, the Court finds persuasive the reasoning of two cases cited by petitioners, *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003), and *Oyedeji v. Ashcroft*, 332 F. Supp.2d 747 (M.D. Pa. 2004). Pet'r Reply at 8 (Docket No. 8). As noted above, there is no formal judicial stay in place. But, even if the Second Circuit ultimately were to enter a formal stay, respondents should not be able to rely on this fact to keep [D'Alessandro] indefinitely detained.

*D'Alessandro v. Mukasey*, 628 F. Supp.2d at 382 (citing *Ly v. Hansen*, 351 F.3d at 272

("[A]ppeals and petitions for relief are to be expected as a natural part of the process. An alien

who would not normally be subject to indefinite detention cannot be so detained merely because

he seeks to explore avenues of relief that the law makes available to him. Further, although an

alien may be responsible for seeking relief, he is not responsible for the amount of time that such

determinations may take. The mere fact that an alien has sought relief from deportation does not

authorize the INS to drag its heels indefinitely in making a decision. The entire process, not

merely the original deportation hearing, is subject to the constitutional requirement of

reasonableness.") (quoted in *Oyedeji*, 332 F. Supp.2d at 754)).

With regard to the district court decisions in *Copes*, *Lawrence*, and *Guner*, respondents

here have failed to provide pinpoint citations or any parenthetical explanations for them. The

reasons for respondents' reliance upon these decisions, let alone whether they are apposite to this

case, is not clear from the face of respondents' brief. After reviewing the cases, the Court does

not find them to be binding or persuasive authority.

First, *Lawrence v. Reno*, 2001 WL 812242, involved a Federal Rule of Civil Procedure

("F.R.C.P.") 60(b) motion for relief from judgment from dismissal of a habeas petition. There was a formal stay in place, and the Second Circuit had dismissed petition for review of the removal order, just before the district court's order regarding the F.R.C.P. 60(b) motion, thereby making "petitioner's removal from the country appear[ ] to be imminent." Again, the circumstances in that case are entirely different from those presented here, and so the case in inapposite. The district court's statement that petitioner "has remained in custody for a lengthy period as a result of his having obtained judicial stays that have blocked his removal from the country," was *dicta* and not necessary to its holding.

Second, *Guner* also involved a motion for relief from judgment under F.R.C.P. 60(b). The district court found that petitioner' reliance on *Zadvydas* "[was] misplaced". Petitioner had challenged the INS's decision to deport him and to deny him relief under § 212(c), and the district court found that it was "these efforts" by petitioner that had "prevented INS from deporting him, and there has been no showing that the Government will be unable to remove petitioner within a reasonable period of time after the completion of these proceedings." Again, as noted above, the effective outcome of these cases was that the petitioner was penalized for pursuing avenues of relief to which he or she was legally entitled, and thus continued detention was the petitioner's own fault. In this Court's opinion, those decisions veer dangerously close to penalizing individuals for attempting to exercising their constitutional right to petition the federal courts for redress.

Respondents argue that despite the Court's "conclusions on the merits of this case, [the foregoing] numerous court decisions have upheld detentions of similar and longer duration than that presented here, particularly where the only obstacle to the alien's removal was a stay of

removal or the Second Circuit forbearance policy." Resp't Mem. at 10-11. Petitioner responds

that this argument "raised the question of *could* detention occur, not whether under the

circumstances as presented by D'Alessandro[,] detention *should* occur." Pet'r Reply Mem. at 4

(emphases supplied). Petitioner points out that once the Government agreed with this Court's

observation at the expedited hearing that D'Alessandro appeared to be an ideal candidate for

supervised release, "none of these issues of whether detention *could* occur are at all relevant,"

Pet'r Reply Mem. at 4 (emphasis supplied), because the agency's decision to continue detention

"was entirely not reasonable[,]" *id.* The Court agreed with petitioner then, and continues to agree

with petitioner now, that unreasonableness permeates every aspect of the Government's litigating

position in defense of its egregiously wrongheaded agency/client, DHS/ICE.

> **2.  Respondent's Second Argument: INA § 241, 8 U.S.C. § 1231, as interpreted by the Supreme Court in *Zadvydas*, permitted petitioner's continued detention.**

Second, respondent contends that 8 U.S.C. § 1231, as interpreted by the Supreme Court

in *Zadvydas*, permitted petitioner's continued detention beyond the six-month period found by

the Supreme Court to be presumptively reasonable; D'Alessandro and this Court disagreed,

concluding that under the circumstances, his 16-month detention was unjustified and in violation

of *Zadvydas*.

According to respondents, the Government's litigating position was a reasonable reliance

on the following language in *Zadvydas*: "the 6-month presumption does not mean that every

alien not removed must be released after six months . . . an alien may be held in confinement

until it has been determined that there is no significant likelihood of removal in the reasonably

foreseeable future." *Zadvydas*, 533 U.S. at 701 (quoted in Resp't Mem. at 13). Respondents

assert that their "reasonable" litigating position continued this reliance on *Zadvydas,* noting that

at the time D'Alessandro instituted this habeas proceeding, there "was no controlling case law

determinative of his claims." Resp't Mem. at 13 (citing *Doherty v. Thornburgh*, 943 F.2d 204,

211 (2d Cir. 1991) and *Dor v. District Director, INS*, 892 F.2d 997, 1002 (2d Cir. 1989). As the

Court stated previously in its Report and Recommendation, *Doherty v. Thornburg*, 943 F.2d 204

(2d Cir. 1991), *Dor v. District Director, INS*, 891 F.2d 97 (2d Cir. 1989),were the only cases

cited by respondents where a stay was not judicially ordered, but the detainee's conduct in

seeking judicial review was said to have contributed to the delay so as to make the delay not

unconstitutional. These were decided over a decade before *Zadvydas'* landmark decision.

Moreover, after reviewing those cases on the facts, this Court found that D'Alessandro's

situation was "poles apart from *Doherty* and *Dor* . . . ." *Id.*;[7] *see also* Pet'r Reply Mem. at 10

---

[7]     This Court previously had distinguished *Dor* and *Doherty*, commenting:
 In Doherty, the alien had been convicted of murder, and the Second Circuit noted, "[o]ver the course of the last eight  years, Doherty has exercised skillfully his rights under the deportation statute, delaying and perhaps preventing the outcome sought by the government. He has resisted deportation when it would result in his return to Great Britain, agreed to deportation when it would not result in his return, and then resumed his resistance to deportation when circumstances changed. Only in the face of the impending elimination of the political offense exception did Doherty seek to expedite the deportation process and, when it appeared that his destination of choice no longer offered a haven from extradition, he sought relief from deportation, once again slowing down the process." 943 F.2d at 211. Although his litigation strategy was "perfectly permissible," the Second Circuit held that he could "not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process." Id. In Dor, the Second Circuit observed that he had "pursue[d] repeated, unsuccessful appeals of the various administrative decisions that he is statutorily barred from adjustment," and had "come[ ] perilously close to [their prior] admonition [in an earlier case] that '[parties] cannot litigate pretrial matters to the ultimate degree and then rely on the extra time attributable to their practice to claim that the duration of pretrial detention violates due process.' " Dor, 891 F.2d at 1003 (quotation omitted). In D'Alessandro's case, the New York Court of Appeals has taken the rather  extraordinary step of agreeing to review the denial of a writ of error coram nobis from 2000. In all of this Court's time on the bench researching habeas law and New York state court criminal law, it can attest to the affect that coram nobis relief is extremely rare to begin with. This Court has never seen the New York Court of Appeals grant discretionary leave in such a matter. Petitioner's attorney represented at oral argument that he has been contacted by numerous practitioners regarding the unusualness of this event. As noted elsewhere in this Report and Recommendation, if D'Alessandro is successful before the New York Court of Appeals, that calls into question the validity of his underlying criminal conviction, which is the sole basis for hi had been convicted of ms deportation.

n.10. Accordingly, the Government's ardent reliance upon these factually inapposite cases weighs against a finding that its litigating position was "substantially justified."

> ### 3.    Respondent's Third Argument: Case law from within this district supported continued detention under the circumstances presented here[.]"

Respondent argues that its litigating position was "substantially justified" because other district judges in the Western District of New York "have accepted the arguments the government presented in this case and have upheld continued detentions of similar length to that presented in this case." Resp't Mem. at 12 (citing *Garcia v. Herron*, 09-CV-416(MAT) (W.D.N.Y. Oct. 1, 2009) (finding that it could be said that removal was not "practically attainable" in petitioner's situation, and petitioner had a history of failure to comply with conditions of release as evidenced by his violation of a previous order of supervision; following his apprehension as a fugitive, DHS made an individualized custody determination that Garcia was a flight risk); *Ramos v. Chertoff*, 07-CV-858A (W.D.N.Y. June 2, 2009) (petitioner withheld his true identity and provided false information, causing court to find that he acted to prevent his removal within the meaning of 8 U.S.C. § 1231(a)(1)(C), thereby making his continued detention under that provision is lawful); *Gordon v. Herron*, 08-CV-508S (W.D.N.Y. Mar. 31, 2009) (formal Second Circuit stay in place). These cases present wholly different factual situations and are inapposite to the case at hand. The Government argues "substantial justification" for its particular litigating position existed because it, for strategic reasons, was attempting to have "reasoning that has been applied by courts in cases where court-ordered stays were entered and the removal period suspended under 8 U.S.C. § 1231(a)(1)(B)(ii)

applied to petitioner's case where the stay was informal." Resp't Mem. at 12 (citing *Plummer v. Ashcroft*, 258 F. Supp.2d 43, 48 (D. Conn. 2003). *Plummer* was not cited by respondents in opposition to the habeas petition, not that it would have made any difference, as that case's facts and conclusions do not fit here. Petitioner Plummer asserted that his current detention by the INS was unconstitutional. Although Plummer's appeal was dismissed by the BIA on December 21, 2001, Plummer requested the district court to stay his deportation until a full and complete hearing on the merits of the action and any appeal therefrom had been completed. The district court entered the requested stay, and Plummer's removal was prevented during the pendency of these proceedings challenging the underlying immigration proceedings. Thus, the district court of Connecticut denied Plummer's request for release, holding that "the delay in Plummer's deportation [wa]s attributable solely to his efforts to challenge his removal in this Court, and [wa]s not unlawful." *Id.* (citing *Abimbola v. Ashcroft*, No. 01 CV 5568, 2002 WL 2003186, at *7 (E.D.N.Y. Aug.28, 2002); *Guner v. Reno*, No. 00 Civ. 8802, 2001 WL 940576, at * 2 (S.D.N.Y. Aug.20, 2001); *Copes v. McElroy*, No. 98 Civ. 2589, 2001 WL 830673, at *6 (S.D.N.Y. July 23, 2001); *Lawrence v. Reno*, No. 00 Civ. 4559, 2001 WL 812242, at *1 (S.D.N.Y. July 18, 2001). Notably, *Plummer* and the cases it cited (which were also discussed and distinguished earlier by this Court in its previous Report and Recommendation and above in this Decision and Order) preceded the REAL ID Act. Furthermore, *Plummer* contained no *Zadvydas* analysis. Finally, unlike the situation in D'Alessandro's case, Plummer's appellate proceedings concerning his removal order indeed were at an end at the time the district court issued its decision, making the imminence of deportation realistic; the district court was vacating the stay in the same order in which it was denying release: "In any event, the stay presently preventing Plummer's deportation

is dissolved as set out below, and the claim is thus moot."

Moreover, as petitioner's attorney points out, the Government was not prevented from removing D'Alessandro prior to this Court's granting of the writ, because the Second Circuit's stay of deportation was issued only after he was released from detention. Pet'r Reply Br. at 10.

4.    **Respondent's Fourth Argument: Second Circuit precedent, decided pre-*Zadvydas* but not overruled, supported continued detention.**

As petitioner argues, the first three arguments were roundly rejected by this Court in its Report and Recommendation. Beyond the fact that respondents have not come forward with case law to support "the ability to *continue* detention when no formal stay is in effect," Pet'r Reply Mem. at 10, respondents' argument "in opposition once again misses the point that even though the Government can detain certain people beyond six months, they could not reasonably detain D'Alessandro in that he was not a flight risk or a danger, . . . nor was he provided with he constitutionally and statutorily required and analysis and reviews if detention is continued beyond six months." *Id.*

Respondents' fourth argument as to the "substantial justification" for its litigating position likewise does not carry the day. As discussed above in Section 2 of this Decision and Order, the Court has already rejected the outdated Second Circuit precedent upon which respondents heavily rely, e.g., *Dor v. INS* and *Doherty v. District Director,* to argue that D'Alessandro's continued detention was proper.

5.    **As this Court previously found, respondents position throughout this litigation lacked, and continues to lack, substantial justification.**

Respondent argues that the legal standard under the EAJA is distinct, and an EAJA inquiry should not be collapsed into the antecedent consideration of the merits. *See Cooper v.*

*United States R.R. Retirement Board*, 24 F.3d 1414, 1416 (D.C. Cir.1994). Thus, the court must

base its determination on "the record (including the record with respect to the action or failure to

act by the agency upon which the civil action is based) which is made in the civil action," 28

U.S.C. § 2412(d)(1)(B). However, the district court makes only one threshold determination on

the "substantially justified" for the entire action. *Commissioner, INS v. Jean*, 496 U.S. 154, 159

(1990). The "substantially justified" standard places the burden on the government to "make a

'strong showing' that its action was 'justified to a degree that could satisfy a reasonable person.'"

*Healey v. Leavitt*, 485 F.3d 63, 67 (2d Cir. 2007). "The Government's position includes both the

position taken by the United States in the civil action and the action or failure to act by the

agency upon which the civil action is based." *Id.*

It is well-established that "the Government's prelitigation conduct or its litigation

position could be sufficiently unreasonable by itself to render the entire Government position not

'substantially justified,'" *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d

Cir.1996); *see also Watt*, 722 F.2d at 1086 ("The government may lack substantial justification

for its position even though it does not insist upon an unreasonable stance through to the

resolution of a case."). As petitioner points out, this Court's Report and Recommendation, which

was adopted in full by Chief Judge Arcara, "went beyond a general finding of unreasonableness .

. . [and] described the unreasonableness [of the Government's position] in detail . . . ." Pet'r

Reply Mem. at 5. Petitioner argues that by doing so, this Court has already determined that the

Government's and DHS/ICE's positions were "far from substantially justified" and therefore the

Government cannot make such a showing in the context of defeating petitioner's the EAJA fee

motion. Pet'r Reply Mem. at 5 (citing *Federal Election Comm'n v. Political Contributions Data*,

*Inc.*, 995 F.2d 383, 386 (2d Cir. 1993) (citing *Oregon Natural Resources Council v. Madigan*, 980 F.2d 1330 (9th Cir. 1992)).

The Second Circuit, faced with an EAJA application in *Federal Election Comm'n v. Political Contribution Sys.*, that "the earlier Circuit] panel's careful analysis of the government's position allow[ed] no further consideration of th[e] issue [of 'substantial justification']" because "the legal standards which governed the merits phase of this litigation are precisely those to be applied to the EAJA question." *Federal Election Comm'n v. Political Contributions Data, Inc.*, 995 F.2d at 386. Under the EAJA, the government's position is deemed reasonable only if it has a "'reasonable basis both in law and in fact,'" *id.* (quoting *Pierce v. Underwood*, 487 U.S. at 565). Likewise, in granting summary judgment to appellant, the previous Second Circuit panel in *Political Contributions Data, Inc.* found the Commission's position unreasonable in light of the plain language and legislative history of the statute, all of which were known to the Commission at the time it undertook this litigation. Accordingly, the panel considering the EAJA application held that "the previous panel ha[d] conclusively established that the Commission's position was not substantially justified so as to bar an award of attorney's fees. The Second Circuit relied upon *Oregon Natural Resources Council v. Madigan*, 980 F.2d 1330, where "a panel considering an EAJA fee application was bound by a previous panel's holding that the government's position had been unreasonable, at least when in so determining the first panel had carefully considered the language and legislative history of the statute in question." *Id.* (citing *Oregon Natural Resources Council v. Madigan*). As the Ninth Circuit had in *Oregon Natural Resources Council v. Madigan*, the Second Circuit came to "this conclusion not because the government lost its claim, but because a previous panel of this court determined that the statutory language and

legislative history were clear." *Federal Election Comm'n*, 995 F.2d 383, 387 (quoting 980 F.2d at 1332); *see also Thangaraja v. Gonzales*, 428 F.3d 870, 874 (9th Cir. 2005) ("Our holding that the agency's decision of Thangaraja's case was unsupported by substantial evidence is therefore a strong indication that the "position of the United States" in this matter was not substantially justified. Indeed, it will be only a "decidedly unusual case in which there is substantial justification under the EAJA even though the agency's decision was reversed as lacking in reasonable, substantial and probative evidence in the record.'") (quoting *Al-Harbi v. INS*, 284 F.3d 1080,1085 (9th Cir. 2002)).

I agree with petitioner. Here, this Court roundly rejected *all* of the arguments put forth by respondents during the pendency of the habeas decision. In this Court's opinion, the Government and DHS/ICE have lacked substantial justification for their positions from the very beginning of this case. As I specifically stated in my Report and Recommendation,

> For all of the foregoing reasons, I recommend finding that DHS/ICE's review of D'Alessandro's custody has been grossly defective in constitutional terms, and that its decisions to continue detention have neither been in accordance either with Due Process requirements as interpreted by *Zadvydas v. Davis* nor in compliance with DHS/ICE's own regulations. Furthermore, I recommend finding that DHS/ICE's conclusion that D'Alessandro is a flight risk or a danger to the community is patently unreasonable in light of the evidence in the record. Indeed, it is contradicted by the record. Finally, I recommend concluding that D'Alessandro has demonstrated that his detention is illegal under *Zadvydas* in that he has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701, 121 S.Ct. 2491, and that respondents have not rebutted that showing. Accordingly, I recommend that the petition be granted unconditionally, and D'Alessandro released immediately pursuant to reasonable conditions of supervision and bond, as determined by DHS, subject to review and oversight by the District Court.

*D'Alessandro v. Mukasey*, 628 F. Supp. at 406. The Government offers no support for its intimation that sometimes the word "unreasonable" may be susceptible to different meanings. In

general, and in this case specifically, "unreasonableness," as it is commonly understood in the law, has been the touchstone of respondents' legal positions. When something is described as "grossly defective in constitutional terms," as this Court found DHS/ICE's review of D'Alessandro's custody to be, it cannot be "substantially justified." Likewise, when this Court has found that finds respondents' conclusions concerning D'Alessandro' a flight risk or danger to the community to be "patently unreasonable in light of the evidence in the record" and, "indeed, contradicted by the record," the Court cannot also say that DHS/ICE's stance was nevertheless "substantially justified."

In its Report and Recommendation, this Court has already described in detail the patent unreasonableness and just plain incorrectness of DHS/ICE's custody reviews up until March 25, 2009. Then, on March 31, 2009, DHS/ICE issued a detention determination that displayed an apparent defiance of the Court's findings and statements in its Report and Recommendation and its Bail Decision. Petitioner argues that the March 31, 2009, detention determination "indeed bordered on contempt"; at the very least, I agree that the detention letter ignores the findings in the Report and Recommendation and Bail Order and appears to distort the facts. Pet'r Reply Mem. at 7-8. In particular, the March 31, 2009 letter decides to continue D'Alessandro's detention based upon his "particularly egregious criminal history"–that is, his fifteen-year-old atypical and unusual criminal conviction which, parenthetically, is undergoing an almost unprecedented review by the Appellate Division in New York State Supreme Court.

This Court made findings and determinations, and explained for respondents the review that was required by the Supreme Court's explication of due process principles, and DHS/ICE's own regulations. However, the March 31, 2009 letter determination disregarded these, and the

Government has continued to defend this indefensible position, notwithstanding respondents' attorney's agreement at oral argument with this Court's views concerning petitioner's eligibility and qualifications for release.

To summarize, this Court did, as petitioner points out, find that the custody reviews performed by DHS/ICE prior to, and during the habeas litigation, were "grossly defective in constitutional terms." The Government, however, has strenuously and consistently argued that the custody reviews more than substantially complied with constitutional due process requirements, even after the Court specifically found to the contrary. The Government's obstreperousness concerning the D'Alessandro matter has continued, reaching its pinnacle in the March 31, 2009, letter denying release, despite the Court's extremely detailed factual findings and directives in its Report and Recommendation and Bail Order. Although the Court had determined that "DHS's conclusion that D'Alessandro is a flight risk or danger to the community is patently unreasonable in light of the evidence in the record," DHS/ICE in its March 31, 2009 letter denied release based solely upon D'Alessandro's alleged dangerousness to the community, based only upon his decades-old criminal conviction. The Government, in its opposition to the Report and Recommendation, then attempted to defend this final detention decision, despite its earlier concession that D'Alessandro had all of the qualities one wished to see in a candidate for supervised release. Furthermore, the March 31, 2009 denial speaks only of the alleged "danger" posed by D'Alessandro but makes no mention that there is any likelihood of removal in the reasonably foreseeable future and fails to include any assessment of petitioner's flight risk. *See* Pet'r Motion for Atty Fees, at 13, ¶28 (Docket No. 39-2). Petitioner argues that "detention after six months based on special danger requires the additional due process protections of 8 C.F.R. §

241.14, none of which occurred during this custody review. *Id.*

Thus, at each step of the litigation, the Government and DHS/ICE have compounded each other's errors, oversights, and mistaken interpretation of the facts. Indeed, the Court cannot find that any of their actions and omissions were justified to a degree that could satisfy a reasonable person. *See Barwari v. Mukasey*, 282 Fed. Appx. 896, *898, 2008 WL 2595195, **2 (2d Cir. June 30, 2008) ("At the very least, the immigration judge needed to consider [a legal]  holding and analyze its effect on Barwari's claim. Instead, he failed to mention [the holding] at all. Second, even leaving aside the immigration judge's legal analysis, his factual findings were also flawed. He pointed to changed country conditions in Iraq following the U.S.-led invasion, but failed to analyze in any depth how these changes would affect Barwari's particular situation. He did not consider, for instance, the risk of harm due to Barwari's strong connections to the United States or her husband's work for a U.S. government contractor. Instead, the immigration judge simply assumed, without analysis, that the only risk of harm facing Barwari comes from anti-U.S. insurgents with no ties to the Iraqi government. . . . [T]he immigration judge's lack of reasoning frustrated any attempt at meaningful judicial review. *Barwari*, 258 Fed. Appx. at 385.The immigration judge's errors, of course, might have been pointed out by the Department of Homeland Security (DHS) when Barwari challenged her removal order before the BIA; instead, the DHS defended the order with the conclusory argument that 'country conditions in Iraq have materially changed.' Regardless of the DHS's position, the BIA might still have corrected the immigration judge's decision; instead, it adopted this decision without even mentioning *Khouzam*-which had been controlling law for over two years at that point. As a result, the agency ended up issuing a final order for Barwari's expulsion to Iraq based on a flimsy

analysis of both the law and the facts. Because this action was not justified to a degree that could satisfy a reasonable person, it was not "substantially justified" within the meaning of the EAJA and Barwari is entitled to fees.") (citing *Healey v. Leavitt*, 485 F.3d at 67).

      **6.**      **There are no "special circumstances" which would make an award of attorney's fees to petitioner unjust**

As discussed above, The Government has failed to show that its position, both administratively and before the judiciary, had a reasonable basis in law and fact, in order for it to satisfy its burden of demonstrating that its position was substantially justified so that opposing party would not be entitled to recover attorney fees under the EAJA. The EAJA provides that the court shall award fees to a prevailing party unless the court finds that "special circumstances make an award unjust." Like the "substantial justification" exception, the Government bears the burden of establishing that "special circumstances" should preclude recovery. *Love v. Reilly*, 924 F.2d 1492, 1495 (9th Cir. 1991). "Courts look to traditional equitable principles when deciding whether special circumstances would make an award of attorney's fees unjust." *McKay v. Barnhart*, 327 F. Supp.2d 263, 267-68 (S.D.N.Y. 2004) (citing *United States v. 27.09 Acres of Land*, 43 F.3d 769, 772 (2d Cir.1994); *Oguachuba v. INS*, 706 F.2d 93, 98 (2d Cir.1983)). Petitioner argues that the Court's decision granting habeas relief achieved a "just result" because D'Alessandro's detention was "grossly defective in constitutional terms."

As "special circumstances", respondents point to petitioner's alleged dilatoriness, arguing that D'Alessandro should have moved to reopen his immigration proceedings before the Second Circuit years earlier, and should have processed those proceedings in a more expeditious manner once they were begun. Resp't Opp. Mem. at 17. Respondents' argument ends with a citation to a

case stating that it is inequitable" to require the public to support legal bills for a litigant who has "flout[ed] American law." *Oguachuba v. INS*, 706 F.2d 93 (2d Cir. 1983). Respondents have failed to explain how D'Alessandro has "flouted" American law. Nor have respondents shown that petitioner could have acted with any greater expediency in pressing his various legal challenges against the Government.

Respondents' argument seems to be that had all of the Circuit-related issues been previously resolved, then respondents would not have been in the position to, or had the opportunity to, improperly detain D'Alessandro. Pet'r Reply Mem. at 12-13. Respondents curiously are not claiming that the detention was acceptable, but rather that circumstances could have occurred in another way that would not have placed them in the position of having to decide whether or not to detain petitioner. *Id.* This argument essentially boils down to asserting that had D'Alessandro not been arrested decades ago, none of this would have happened and is rejected as illogical. *See* Pet'r Reply Mem. at 13.

Respondent's arguments concerning "special circumstances" continue in the same vein and are unconvincing. The Court can discern in the record no "special circumstances" that would make an award of attorney's fees to petitioner unjust. In sum, I conclude that the "position of the United States" was not substantially justified in this case. D'Alessandro is therefore entitled to attorney's fees and costs.

### 7. Amount of fee award – appropriateness of enhanced fees

D'Alessandro asserts entitlement to attorney's fees in the total amount of $88,218.97. The requested hourly rate for his lead counsel, Brian Gardner, Esq., is $350. The requested hourly rate for Gardner is higher than the $125 hourly rate contained in EAJA, based on the asserted

special factor of "the limited availability of qualified attorneys for the proceedings involved." 28 U.S.C. § 2412(d)(2)(A). In the alternative, Gardner claims fees at the statutory rate. Gardner also claims fees for Christopher Tumulty, Esq., the associate who assisted Gardner in this matter. With regard to Tumulty, the rate claimed is $178.38 per hour, based on a cost-of-living adjustment made to the statutory $125 per hour rate. Pet'r Motion for Atty Fees at 14, ¶30 (Docket No. 39).

The EAJA allows for "reasonable attorney fees," which are to be "based upon prevailing market rates for the kind and quality of the services furnished," but may not exceed "$125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A); *see also Healey*, 485 F.3d at 68; *Barwari v. Mukasey*, No. 06-3238-ag, 282 Fed. Appx. 896, *899, 2008 WL 2595195, **2 (2d Cir. June. 30, 2008). "Where such qualifications are necessary and can be obtained only at rates in excess of the [statutory] cap, reimbursement above that limit is allowed." *Id*. The district court's decision to exceed the [statutory] cap is reviewed for abuse of discretion. *Id.* at 571.

In *Pierce v. Underwood*, 487 U.S. 552 (1988), the Supreme Court considered what Congress meant by a "special factor" in the EAJA statute, and concluded that Congress intended that courts exceed the statutory fees limit only if there was a limited availability of "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question." *Id.* at 572. The Supreme Court explained in *Pierce* that

> "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having

some *distinctive knowledge or specialized skill needful for the litigation in question*–as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are *necessary* and can be obtained only at rates in excess of the $75 cap, reimbursement above that limit is allowed.

487 U.S. at 572 (emphases supplied); *see also Jean v. Nelson*, 863 F.2d 759, 774 (11th Cir. 1988) (describing the "limited construction" given to the phrase "limited availability of qualified attorneys" and opining that "[t]he [Supreme] Court's view is clear: a mere short supply of qualified lawyers willing to take a case for $75 per hour or less does not mean that there is a 'limited availability of qualified counsel.'") (citing *Pierce*, 487 U.S. at 572). "Though the Second Circuit does not appear to have addressed the issue, other circuits have held that an immigration law specialty does not, absent more, satisfy the extraordinary skills requirement necessary for an increased fee." *Chen v. Slattery*, No. 94 CIV. 2585 (DAB), 1995 WL 498766, at *3 (S.D.N.Y. Aug. 22, 1995) (citing *Ramon-Sepulveda v. Immigration and Naturalization Svc.*, 863 F.2d 1458, 1462 (9th Cir.1988); *Perales v. Casillas*, 950 F.2d 1066, 1078 (5th Cir.1992)); *see also Barwari v. Mukasey*, 282 Fed.Appx. at *899, 2008 WL 2595195, at **2 ("Any award above this maximum must be justified by a "special factor, such as the limited availability of qualified attorneys for the proceedings involved," 28 U.S.C. § 2412(d)(2)(A), and we are unpersuaded that such a factor exists in this [immigration] case. While certain immigration cases may well require the type of distinctive knowledge or specialized expertise that warrants a fee enhancement, this was not one of them. *Cf. Healey*, 485 F.3d at 68-70 (rejecting fee enhancement for Medicare case that did not require knowledge or skills beyond the ordinary). Indeed, contrary to the arguments advanced by Barwari's counsel, we find the issues in this petition for review relatively

straightforward and the agency's error obvious."); *Floriou v. Gonzales*, 498 F.3d 746 (7th Cir.

2007) ("We have endorsed the view that attorneys with specialized immigration experience may

be entitled, in certain cases, to an award in excess of the statutory maximum. We have suggested

such an award may be appropriate when a petitioner demonstrates that his attorney brought

'relevant expertise to a case, such as knowledge of foreign cultures or of particular, esoteric

nooks and crannies of immigration law, in which such expertise is needed to give the alien a fair

shot at prevailing.'") (quoting *Muhur v. Ashcroft*, 382 F.3d 653, 656 (7th Cir. 2004)); *Johnson v.

Gonzales*, 416 F.3d 205, 213 (3d Cir. 2005) (noting that a case involving straightforward

application of established standards, rather than "little-known areas of immigration law or

particular knowledge of [the petitioner's] culture-factors" did not justify a fee enhancement under

EAJA)).

Given the weight of the authority cited above, this Court is not persuaded that a "special

factor" exists in the present case so as to justify enhancement of the statutory fee rate. However,

the Court agrees with D'Alessandro's attorney that a fee adjustment is warranted based on the

increase in cost of living between March 1996 (when the statutory cap of $125 per hour was set)

and December 2008 (when D'Alessandro retained attorney Gardner's services for this petition).

As per the Second Circuit's case law, the Court has calculated this increase based on the

Consumer Price Index for the urban areas of the Northeastern United States. *Barwari*, 282 Fed.

Appx. 896, *899, 2008 WL 2595195, **2 (citing *Harris v. Sullivan*, 968 F.2d 263, 265 (2d

Cir.1992)). According to information obtained directly from the Administrative Office for the

United States Courts on the cost-of-living-increase, this results in an adjustment to the maximum

attorney fee rate from $125 to $ 177.51 per hour.

The Government alleges generally that attorney's fees should not be paid due to "duplication of effort and due to the excessive time expended to perform routine tasks." Resp't Mem. at 27; Pet'r Reply Mem. at 17. With regard to the duplication of efforts, the Government only cites to one time entry, which was the first entry of the slip listing on December 3, 2008, for which Gardner and Tumulty both charged six (6) hours. It does appear that there was some duplication of efforts. Although this is not unusual in litigation such as this; the Court will decline to reimburse for the six (6) hours spent by Christopher Tumulty, the associate, on December 3, 2008, thereby reducing the number of total billable hours by six (6). Therefore, the total number of billable hours for the period December 3, 2008, to January 8, 2009, (i.e., 60.49 hours) will be reduced by 6 hours for a total of 54.49 billable hours for that period.[8]

The total billable hours for February 10, 2009, to June 2, 2009, amount to 182.72 hours. The Court finds this amount to be reasonable.

The Court notes that counsel has billed 57.20 hours from June 2, 2009, to August 21, 2009, for the sole purpose of perfecting his EAJA attorney's fees claim. The Court acknowledges that there is no impediment to the award of attorney's fees for this purpose. *E.g.*, *Soto-Valentin v. Heckler*, 619 F. Supp. 627, 630 (S.D.N.Y. 1985) (Disability and supplemental security income claimant was entitled to recover under the Equal Access to Justice Act, 28 U.S.C.A. § 2412] attorney fees for time expended in connection with the claim on the merits, and on the motion for attorney fees, as well as costs of stenographic transcript and cost for local transportation for court reporter) Nevertheless, while the Court does not question counsel's representations concerning the time spent on this issue, after due deliberation and reflection, it

---

[8] Petitioner has submitted three sets of billing records, covering three time periods.

considers the request excessive. Accordingly, the Court will allow 30 of the 57 hours requested as reasonable attorney's fees.

The grand total of billable hours for the entire matter is 267.21 (54.49 + 182.72 + 30) hours, which this Court finds to be reasonable given the particular circumstances of this case. *Cf.*, *e.g.*, *Nadarajah v. Holder*, 569 F.3d 906, 925 (9th Cir. 2009) (awarding an EAJA attorney fee for 160.9 hours spent litigating an immigration habeas corpus at the District Court level); *Freeman v. Mukasey*, No. 04-35797, 2008 WL 1960838, at *3 (9th Cir. Feb.26, 2008) (awarding an EAJA attorney fee for 279.9 hours that two attorneys and three summer associates spent litigating an immigration habeas petition at both the District Court and appellate levels); *Kholyavskiy v. Schlecht*, 479 F. Supp.2d 897, 910 (E.D. Wis. 2007) (awarding an EAJA attorney fee for approximately 170 hours spent litigating an immigration habeas petition); *Scarlett v. U.S. Dept. of Homeland Sec. Bureau of Immigration and Customs Enforcement,* No. 08-CV-534A, 2010 WL 55929, at *4 (W.D.N.Y. Jan. 10, 2010) (Arcara, D.J.) ("Here, petitioner has proposed a total fee award of $18,481.74 that covers 134.3 hours that five attorneys spent responding to respondent's objections to the Report and Recommendation. Although every case obviously presents different factual circumstances, spending that much time advancing an immigration habeas petition is not categorically unreasonable.").

At a rate of $177.51 per hour, the total award of fees to petitioner D'Alessandro is $47,432.45 (267.21 hours x $177.51), less any retainers or fees previously paid by D'Alessandro to counsel. *Barwari v. Mukasey*, 82 Fed. Appx. 896, *900, 2008 WL 2595195, **3-4. The total costs awarded to him are $670.70.

**IV.     Conclusion**

For the foregoing reasons, the Court grants petitioner Giuseppe D'Alessandro's motion in part, and awards EAJA fees in the amount of $47,432.45 plus costs in the amount of $670.70. The Court denies D'Alessandro's motion to the extent that he seeks fees beyond this amount.


**IT IS SO ORDERED**                              /s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  March 31, 2010
Buffalo, New York